929 A.2d 546

**ATTORNEY GRIEVANCE COMMISSION of Maryland**

v.

**HEKYONG PAK.**

**Misc. Docket AG No. 83, Sept. Term, 2005.**

Court of Appeals of Maryland.

Aug. 2, 2007.

Dolores O. Ridgell, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Atty. Grievance Com'n), for petitioner.

Francis S. Brocato (Brocato, Price & Janofsky), Towson, for respondent.

Argued before BELL, C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE and ALAN M. WILNER (retired, specially assigned), JJ.

CATHELL, J.

The Attorney Grievance Commission ("the Commission"), acting through Bar Counsel, and pursuant to Maryland Rule 16–751(a)(1)[1] filed a petition for disciplinary action in the

---

1. Maryland Rule 16–751 provides, in relevant part:

Court of Appeals against Hekyong Pak, a.k.a. H. Christina Pak, respondent. The petition charged that respondent violated several of the Maryland Rules of Professional Conduct ("the MRPC").[2] Specifically, the petition alleges that respondent, through her actions subsequent to a default on a loan secured by her parents, violated Rules 3.3 (Candor the Tribunal),[3] 4.1 (Truthfulness in Statements to Others),[4] 5.5 (Unau-

"(a) **Commencement of disciplinary or remedial action.** (1) Upon Approval of Commission. Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals."

2. By an Order of February, 8, 2005, we adopted changes to the Maryland Rules of Professional Conduct, effective July 1, 2005. The conduct that led to this case occurred before the effective date of the new Rules Therefore, the Maryland Rules that were in effect at the time of the alleged conduct will be enforced herein. We note however, that our conclusions would not be different if conduct similar to that in this case occurred under the presently adopted Maryland Rules. The differences in the Rule sections that were allegedly violated are not material and would not lead to different conclusions.

3. Rule 3.3(a)(1) and (2) of the 2005 version of the MRPC provide:

"(a) A lawyer shall not knowingly:
(1) make a false statement of material fact or law to a tribunal;
(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;
The current version of MRPC 3.3(a)(1) and (2) provides:
"(a) A lawyer shall not knowingly:
(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;
(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client."

4. Rule 4.1(a) 2005 version of the MRPC provides:

"(a) In the course of representing a client a lawyer shall not knowingly:
(1) make a false statement of material fact or law to a third person; or,
(2) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client."
The current version of the Rules is identical.

thorized Practice of Law),[5] and 8.4(c) and (d) (Misconduct)[6]. Pursuant to Maryland Rule 16–752(a),[7] we referred the matter to the Honorable Timothy J. Martin of the Circuit Court for Baltimore County to conduct an evidentiary hearing and return to this Court factual findings and recommended conclusions of law.

The facts of this case arise out of respondent's conduct during a period of time when her parents had purchased property in Pennsylvania, defaulted on a personal guarantee loan on that property, and then executed a series of transactions in order to prevent a judgment from attaching to their property. Using her knowledge of the law, respondent aided and advised her parents in creating shell corporations to transfer title in order to avoid a judgment lien. Due to her actions in these matters, the Commission filed a petition for disciplinary or remedial action with this Court.

---

5. Rule 5.5(a)(b) of the 2005 version of the MRPC provides:
 "A lawyer shall not:
 (a) practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction; or
 (b) assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law."
 The current version of MRPC 5.5(a), in relevant part states:
 "(a) A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so."

6. Rules 8.4(c) and (d) of the 2005 version of the MRPC provide:
 "It is professional misconduct for a lawyer to:
 (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
 (d) engage in conduct that is prejudicial to the administration of justice ..."
 The current version of the Rules is identical.

7. Maryland Rule 16–752 provides, in relevant part:
 "(a) **Order.** Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing."

## I. Facts

Pursuant to Maryland Rule 16–752(a), we, as stated earlier, referred this matter to Judge Martin of the Circuit Court for Baltimore County to hold an evidentiary hearing. A preliminary hearing was held on June 5, 2006, to address respondent's jurisdictional objections. At the hearing, respondent claimed that this Court does not have jurisdiction to regulate the conduct of attorneys in the State of Maryland if the Peer Review Panel ("Panel") recommends to the Commission that no action should be taken against an attorney suspected of violating the MRPC.

The Panel is a group, established by Maryland Rule 16–742, that serves to consider a Statement of Charges against an attorney. Its purpose is not an adversarial one, and it does not hold evidentiary hearings, decide facts, or write full opinions. Md. Rule 16–743. The Panel consists of at least three members, the majority being attorneys, but at least one member must be a lay person. At the preliminary hearing, Judge Martin dismissed respondent's jurisdiction argument, noting that it would be "illogical" to accept respondent's position that the matter should be dismissed based on the Panel's finding. The hearing court also stated that the Panel is not an entity that creates binding decisions and that, if it were found to do so, such a decision would divest the Court of Appeals of its jurisdiction.

As previously indicated, this case arose from the actions of respondent in connection with a hotel that was purchased by her parents and her subsequent actions which led to the Commission filing a petition for disciplinary or remedial action. On February 22, 2007, after a three day evidentiary hearing, Judge Martin issued the following findings of fact:

"This court, having been persuaded by clear and convincing evidence, finds the following facts:

"1. Respondent was admitted to the Bar of the Court of Appeals of Maryland on December 19, 1990.

"2. Respondent is the only child of Hosurl and Kyuryon Pak (hereinafter known as the 'Paks'). The Paks are immi-

grants from Korea who have been naturalized United States' citizens since the 1970's.

"3. Respondent had her real estate license while in her teens. The Paks have owned and operated several businesses over the past 30 years. Mr. Pak is a real estate broker since the 70's with substantial experience in real estate transactions, the preparation and review of real estate contracts and the negotiation of same. Mrs. Pak sold real estate with her husband for some 10 years during the Paks' marriage.

"4. Between 1990 and 1999, Respondent had substantial professional experience in business transactions, the creation of business entities, the creation and review of business contracts and in real estate transactions. This court finds that she had substantial acumen and experience in these types of matters.

"5. In 1999 on behalf of the Paks, Respondent created MEPA Acquisitions LLC (hereinafter 'MEPA') by creating both the Articles of Organization and an operating agreement regarding same. Respondent caused the necessary documents to be filed with the State Department of Assessments and Taxation to create the entity.

"6. MEPA was owned by Mr. Hosurl Pak with other individuals.

"7. MEPA acquired interest in a hotel in Lancaster, Pennsylvania in 1999. Respondent represented MEPA in the negotiations and transactions to acquire the hotel.

"8. MEPA incurred a first mortgage on the hotel property at the time of the purchase.

"9. Respondent acted as counsel for MEPA in negotiating and securing a second loan of $1 million from an entity known as Business Loan Center (also known as Business Loan Express, hereinafter 'BLE'). She wrote an opinion letter on behalf of MEPA to BLE in order to secure this loan.

"10. BLE required the personal guarantees from all the members of MEPA as joint and several obligors on the

second loan. The Paks gave their personal guarantees in February 1999. Part of the application process required the Paks to provide financial statements reflecting their assets and liabilities. Respondent had actual knowledge of these guarantees.

"11. Between 1999 and 2001, Respondent helped the Paks from time to time in the management of the hotel in Pennsylvania.

"12. At the time of the BLE loan in 1999, the Paks owned real estate in Maryland on Oak Ridge Court [Baltimore County], Summer Fields Court [Baltimore County] and North Avenue [Baltimore City].

"13. In 1999 and thereafter, the Respondent had actual knowledge of the real properties owned by her parents.

"14. Between 2000 and 2003, in addition to her business, transactional and other professional experience, Respondent was the sole owner and manager of Bayside Title which handled real estate settlements. Respondent's Bayside Title did hundreds of real estate settlements in 2002 alone.

"15. In 2001, MEPA sold the hotel to an entity known as RELEX. Respondent represented her parents in the sales transaction. RELEX assumed the BLE second loan obligation as part of the purchase. However, BLE did not release the personal guarantors on the BLE obligation including the Paks.

Respondent had actual knowledge of the non-release of her parents immediately after the transaction involving RELEX.

"16. Between 2001 and early 2003, RELEX defaulted on the BLE loan obligation and the BLE loan came into default. On or about February 5, 2003, BLE gave actual notice of this default to the Paks. Respondent had actual knowledge of the default notice received by her parents in early February 2003.

"17. The default by RELEX was not cured by any of the guarantors.

"18. As of February 2003, the Paks had sold the Oak Ridge property but continued to own the Summer Fields and North Avenue properties. Respondent had actual knowledge of these facts.

"19. On or about June 9, 2003, BLE filed suit against the Paks in the United States District Court [in the District of Maryland, Northern Division] upon their personal guarantees on the loan. The suit was brought by way of a Complaint for Confessed Judgment.

"20. At the time of the filing the Paks lived in the residence at Summer Fields. Respondent had, from time to time, lived at Summer Fields Court with her parents and had, from time to time, actually paid the mortgage on the property from her own resources.

"21. On about June 14, 2003, the Paks were served with BLE's Complaint for Confessed Judgment and supporting documents. Respondent was given these papers immediately following service upon her parents and had actual knowledge of same.

"22. On or about July 7, 2003, Respondent prepared a Motion to Dismiss to be filed in the U.S. District Court on behalf of her parents. At the time it was prepared and filed, Respondent was not a member of the Bar of the United States District Court. Respondent had her parents execute the pleading pro se. The Paks relied exclusively on their daughter for preparation and filing this Motion.

"23. On or about July 11, 2003, with knowledge of the impending suit, Kyuryon Pak (Respondent's Mother) solely entered into a contract to sell Summer Fields to the Zirkins. This fact was known by the Respondent. The sales price of Summer Fields was $544,500.

"24. On or about July 14, 2003, Kyuryon Pak (the mother of Respondent), with knowledge of the impending suit, entered into a contract to purchase residential property on Autumn Frost Lane. The purchase price was $205,000. This fact was known by the Respondent. The Contract of

Sale provided that the ultimate name of the buyer would be determined at a later date.

"25. On July 15, 2003, but one month and one day after service of the lawsuit and supporting documents upon her parents, Respondent, with actual notice of the default by RELEX, with actual notice of the demand by BLE and the impending lawsuit by BLE against her parents, filed Articles of Organization of the H & K Family Trust, LLC ('H & K'). This was done in an expedited fashion on a one-page document on which the Respondent had interlineated 'Family' as part of the name of this entity. No operating agreement was prepared. The sole members of the H & K Family Trust, LLC were the Paks.

"26. The Respondent created this entity (H & K) for the sole purpose of hindering, delaying, and/or defrauding BLE in its quest for satisfaction of the obligation guaranteed by her parents. Respondent's assertion in this matter that this entity was created for 'tax purposes' at the advice of a 'Mr. Kim' is, to this court, incredible and completely unpersuasive. Although Petitioner has the burden of persuasion by clear and convincing evidence throughout this proceeding, when Respondent asserts a fact as to the reasons for her actions, she must persuade this court by a preponderance of the evidence that it is so. In this she has completely failed.

"27. On July 16, 2003, one day after filing the Articles of Organization of H & K, Respondent prepared and submitted to her parents for execution, quitclaim deeds conveying both Summer Fields and North Avenue to H & K for no consideration. She had her parents execute these deeds and had the deeds recorded in the respective Land Records of Baltimore County and Baltimore City.

"28. Respondent's action with regard to the above transactions was a continuation of her efforts to hinder, delay and/or defraud BLE in its quest for satisfaction of the obligation guaranteed by her parents. Her explanation as to the reasons for her actions, given the facts, circumstances and the time frame involved, were completely incredible and unpersuasive to this court.

"29. On August 1, 2003, Confessed Judgment in excess of $1 million was entered in the United States District Court case against the Paks and the other personal guarantors. Notices were sent and Respondent had actual knowledge of these facts in August of 2003.

"30. On or about August 14, 2003, Respondent created a Certificate of Partnership for CACHA Holdings, LLP. This certificate was filed with the State Department of Assessments and Taxation by the Respondent again on an expedited basis. The Resident Agent of this entity was the Respondent and the address of the LLP was Respondent's address in Ellicott City, Maryland.

"31. On August 15, 2003, but one month after the creation of H & K and having been the titled owner of the Summer Fields property for less than one month, H & K conveyed Summer Fields to the Zirkins for a net to H & K of $243,899.66.

"32. The net proceeds from the sale of H & K to the Zirkins were deposited into Respondent's Bayside Title escrow account.

"33. On the very same day, Respondent handled the settlement on behalf of Bayside Title whereby Autumn Frost was purchased by CACHA Holdings, LLP. The funds used to purchase this residence were the net proceeds from the sale of Summer Fields. The funds not necessary to complete the transaction, i.e. some $37,000, were disbursed from Bayside Title to the Paks.

"34. The deed to Autumn Frost, purchased by CACHA on August 15, 2003, was not recorded in August 2003 after the settlement. There is no record of this transaction until April 22, 2004.

"35. Respondent, on behalf of her parents, purposely failed to record the CACHA deed, with the intent to hinder, delay and/or defraud BLE in its quest to satisfy the personal obligation of her parents.

"36. Respondent knew that the proceeds of Summer Fields, originally the property of her parents, were now in

the Autumn Frost property and still at risk of being discovered and ultimately attached by BLE in its quest for satisfaction of the Paks' obligation.

"37. Again Respondent's assertion that the deed and/or settlement file were lost or misplaced is not accepted by this court. Respondent's obligation to produce sufficient proof of this fact was, in no way, met.

"38. On September 9, 2003, a Motion to Vacate the Confessed Judgment was filed by the Paks in the United States District Court case. A Mr. Levine and Mr. Driscoll represented the Paks.

"39. On December 10, 2003, the United States District Court granted a summary judgment motion on behalf of BLE against the Paks and entered judgment against the Paks in the amount of approximately $1.1 million.

"40. On or about January 2004, BLE, as judgment creditor, began post-judgment proceedings and attempted to schedule the depositions of the Paks.

"41. From August 15, 2003 until January 2004 CACHA had title to Autumn Frost.

"42. The Paks were living in Autumn Frost during this entire time.

"43. On January 15, 2004, the Paks sent a check for $30,000 (part of the $37,000 received by the Paks as excess funds after the purchase of Autumn Frost) to a relative in Seattle. This, according to the Paks, was a part payment of an antecedent debt to Mrs. Kyuryon Pak's other brother. Respondent had actual knowledge of these circumstances.

"44. The action on the part of the Paks and with notice and approval and/or advice of the Respondent were yet further attempts to keep the Paks' property out of the risk of attachment in satisfaction of BLE's judgment against the Paks. This court does not believe the testimony of either the Paks or the Respondent as to the reasons for this transaction and the conveyance of these funds.

"45. On or about February 20, 2004, with the actual knowledge and cooperation of the Respondent, Yong Sung

Kim, Respondent's husband, purchased Autumn Frost from CACHA in his name alone. Mr. Kim never testified in these proceedings. The settlement on this transaction was handled by American Home Title.

"46. The purchase price for the Autumn Frost transaction came from three (3) sources: $5,000 from Respondent's business operating account, $1626.13 from a joint account of the Respondent and Mr. Kim and a loan of $164,000 by Mr. Kim alone.

"47. Respondent's name was never placed on the title to Autumn Frost.

"48. The Respondent, her husband and the Paks have lived in Autumn Frost since August of 2003.

"49. Both the deed from the Sellers of Autumn Frost to CACHA in August of 2003 and the deed from CACHA to Mr. Kim on February of 2004 were recorded *after* the second transaction with the full knowledge and actual involvement of the Respondent (emphasis added).

"50. The actions of Yong Sung Kim with the Paks and with the knowledge, approval and active involvement of the Respondent were yet further attempts to hinder, delay, thwart and/or defraud BLE's quest to obtain satisfaction of its judgment against the Paks

"51. Respondent's assertion that CACHA was created on behalf of or in trust for her mother's brother in satisfaction of an antecedent debt is not believed by this court and is unaccepted. Respondent has failed to prove this fact by a preponderance of the evidence.

"52. On or about February 20, 2004, American Home Title, acting on the instructions from Hosurl Pak and with the advice and approval of the Respondent, wired $196,000 to relatives of the Paks in South Korea. No relatives of the Paks ever testified in these matters.

"53. On or about February 24, 2004, American Home Title, acting on instructions from Hosurl Pak and with the advice and approval of the Respondent, disbursed $4,126 from the Autumn Frost settlement to the Respondent.

"54. The Court finds no existence of an antecedent debt to any relatives of the Paks in Korea. This Court finds these assertions by the Respondent and her parents were yet further attempts to justify their prior actions and were created after the fact to justify these actions in hindering, delaying, thwarting, and/or defrauding BLE in its quest for satisfaction of the guarantees and the ultimate judgment against the Paks.

"55. The transfers of both the Summer Fields and North Avenue properties to H & K were discovered by BLE on or about February 24, 2004 during the deposition of the Paks.

"56. The deposition of the Paks took place four (4) days after Mr. Yong Sung Kim took title alone to Autumn Frost.

"57. Following the depositions of the Paks, on March 2, 2004, BLE filed a complaint in U.S. District Court, District of Baltimore, to set aside fraudulent transfer and conspiracy against the Respondent and H & K as Defendants.

"58. On or about March 25, 2004, Defendant filed an Answer to the Complaint on behalf of herself and H & K. She was not a member of the bar of the United States District Court at the time the Answer was filed.

"59. In Defendant's communications with the U.S. District Court and counsel for BLE, Defendant did not correct BLE's representation that the proceeds of the sale of Summer Fields had been wired to Korea. Defendant failed to correct these representations in her continued efforts to deceive BLE and protect herself in the fraudulent transfer/conspiracy suit.

"60. Defendant did not disclose that the proceeds from the sale of Summer Fields had actually been used to purchase Autumn Frost.

"61. Defendant falsely admitted, in her response to BLE's Request for Admissions of Fact, that the funds from the sale of Summer Fields had been wired to Korea.

"62. Defendant did not disclose in the U.S. District Court proceedings the existence of CACHA Holdings, LLP, the purchase by CACHA of Autumn Frost with the funds

from Summer Fields, nor the purchase of Autumn Frost from CACHA by her husband alone.

"63. On July 9, 2004, Judge Frederick Motz held that the conveyances of Summer Fields and North Avenue properties were fraudulent. He set aside the transactions and entered summary judgment against the Respondent of $200,000 in favor of BLE.

"64. In Defendant's Motion to Alter or Amend the Judgment by Judge Motz, the Defendant again failed to disclose the creation of CACHA, the funding of CACHA's purchase of Autumn Fields, the transfer of Autumn Fields to her husband by CACHA and the facts of that transaction. The Motion was denied by Judge Motz.

"65. The ruling and judgment of Judge Motz were appealed by Defendant to the Fourth Circuit Court of Appeals. The decision of Judge Motz was affirmed by the Fourth Circuit on February 3, 2005. The Fourth Circuit also denied Defendant's Petition for Rehearing and Rehearing En Banc.

"66. At a meeting with Mr. Aronson between March of 2004 and May of 2004, Respondent showed him a document in Korean to which was attached an English translation. This document was a purported promissory note from Kyuryon Pak to her brother allegedly recognizing an antecedent debt from the Paks to her brother. Respondent stated that she first saw the document some time after August 2004 [2003]. Her statements are again contradictory to her action and previous statements.

"67. Respondent told Mr. Aronson that the money did not go to Korea as of the sale of Summer Fields. Respondent contradicted herself in her own responses to request for admission (question 21, Petitioner's exhibit 8).

"68. The Court does not accept Respondent's assertions (or for that matter her mother's) that a promissory note was prepared by her mother in 1995 and executed by her in Korea in consideration of an antecedent debt by her mother and father to her maternal uncle. The timing of the disclo-

sure of this note in these proceedings (after she was sued in 2004), the very language of the note and the allegations that her mother never showed her or her father the note after returning from Korea are unbelievable to this court. Additionally, the failure of credible corroborative evidence of the existence of this antecedent debt and obligation is fatal to Respondent's assertion of this fact.

"69. On July 29, 2004, the Petitioner made inquiry to the Respondent as to the facts and circumstances of the transactions involving her parents' property. In her response on August 25, 2004, Respondent makes absolutely no mention of her creation of CACHA, the transfer of Autumn Frost to CACHA, the subsequent transfer of Autumn Frost to her husband alone or the sources of the funding of the purchase. This court finds that she intentionally failed to disclose these transactions in yet further, if vain, attempts to protect her actions with respect to the BLE suit and BLE's efforts to satisfy the obligation of her parents and, as a matter of fact, to protect herself as to Petitioner's inquiry.

"70. Finally, after a subsequent letter from Petitioner to Respondent on December 21, 2004, she first provided information regarding CACHA and the ultimate transactions regarding the purchase of Autumn Frost.

"71. Melvin Sykes, Esquire, a noted and well-respected expert on these matters, gave expert opinions on behalf of the Respondent. He clearly assumed a valid legal business purpose for the creation of the H & K Family Trust under these particular circumstances and had no opinion on whether there were valid tax/capital gains or other legitimate reasons for the creation of this business entity.

"Mr. Sykes clearly assumed the existence of an antecedent debt of the Paks to a third party in Korea in giving his opinion that the transfer of these funds were merely an allowable preference to one creditor over another.

"The court has found, as a fact, that there were no proven business purposes or valid reason for the creation of H & K Family Trust nor was there an antecedent debt to the Paks'

relatives proven as the Respondent has claimed. As such, this court does not accept the opinions of Mr. Sykes."

Judge Martin also provided the following conclusions of law, based on the facts of the case:

### "§ 3.3. Candor Toward the Tribunal

"Rule 3.3 sets forth special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process. A lawyer acting as an advocate in an adjudicative proceeding has an obligation to present the client's case with persuasive force. Performance of that duty while maintaining confidences of the client, however, is qualified by the advocate's duty of candor to the tribunal.[ ]

"In this case, having made the findings of fact as indicated, this court concludes, by clear and convincing evidence, that Respondent has violated Section 3.3(a)(1) and (2) by her statements under oath wherein she admitted that the money was transferred to Korea from the proceeds of the sale of Summer Fields and she knew that this was untrue. This she did in her answer to the fraudulent lawsuit filed by BLE. Respondent intentionally failed to disclose that the proceeds from Summer Fields had been used to purchase Autumn Frost. She failed to disclose that the Autumn Frost property was owned individually by her husband and the sources of funds for the purchase of Autumn Frost from CACHA. She failed to disclose the creation of CACHA and the transfer ultimately to her husband. She falsely admitted in her Answers to Request for Admissions that the funds from Summer Fields had been wired to Korea and in a Motion to Alter or Amend the Ultimate Judgment she purposely failed to disclose the true labyrinthine course of transactions involving her parents property and the ultimate purchase of Autumn Frost. The court concludes that all of these statements and failures to disclose represent a violation of 3.3(a)(1) and (2)."

### "Rule 4.1 Truthfulness in Statements to Others.

"A lawyer is required to be truthful in dealing with others on a client's behalf (or in this case on a client's or her own

behalf) but generally has no affirmative duty to inform an opposing party of relevant facts. A misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false. Misrepresentation can also occur by partially true but misleading statements, or *omissions that are the equivalent of affirmative false statements* (emphasis added). See comment 1 Rule 4.1.

"This court, after having found facts as described above, concludes by clear and convincing evidence that the Respondent violated Rule 4.1(a)(1) and (2). Respondent's affirmative failure to correct BLE's assertion in its original lawsuit that the funds were wired to Korea from the Summer Fields settlement was both a false statement of fact and a failure to disclose a material fact when disclosure was necessary to avoid a criminal or fraudulent act. These actions or failure to disclose were relied upon by counsel for BLE and certainly represented a statement to a third person. Additionally, Respondent's admission under oath in the Request for Admissions of Fact that the funds were wired to Korea from the Summer Fields settlement was untrue and Respondent's failure to disclose the true nature and extent of all transactions (H & K to Zirkins, Autumn Frost to CACHA, Autumn Frost from CACHA to Respondent's husband) were all intentional failures to disclose material facts to counsel for BLE which would have been necessary to avoid the Paks' fraud upon BLE.

"Additionally, Respondent's response to Petitioner's inquiry of July 29, 2004 certainly required truthfulness and full disclosure of all the transactions involving her parents' property and the ultimate disposition of the funds. Respondent's response of August 25, 2004 (Petitioner's Exhibit 17) is a classic example of her utter failure to be truthful and to disclose what had actually occurred and happened regarding the property. Her response was a violation of Rule 4.1(a)(1) or (2). It wasn't until December of 2004 when she finally decided that the truth must be told."

### *"Rule 5.5(a)(b) Unauthorized Practice of Law, Multijurisdiction Practice of Law*

"This court, having made findings of fact as described above concludes, by clear and convincing evidence, that Respondent violated Code § 5.5(a)(b). A lawyer may practice law only in a jurisdiction in which the lawyer is authorized to practice. A lawyer may be admitted to practice law in a jurisdiction on a regular basis or may be authorized by court rule or order or by law to practice for a limited purpose on a restricted basis.

"(a) applies to unauthorized practice of law by a lawyer, whether through the lawyer's direct action or by a *lawyer assisting another person* (emphasis added). See Rule 5.5, Comment 1.

"Respondent, on behalf of her parents, prepared a Motion to Dismiss BLE's original suit in 2003 when she had not been admitted to practice in the U.S. District Court. Her parents relied upon her exclusively and they signed the Motion at her direction. Respondent had the Motion filed in the litigation. She was clearly practicing law and not admitted to practice law in the United States District Court as required by local rule of the U.S. District Court, Rule 102.1.a.1.

"Additionally, Respondent filed an Answer on behalf of MEPA and herself, to BLE's second action, i.e. the Complaint to set aside the Fraudulent Transfer. This Respondent did prior to her being admitted to the Bar of the United States District Court and is, similarly, a violation o[f] Rule 5.5(a)(b). These conclusions are made pursuant to the facts found and the law applicable, although this court feels the violations are technical in nature and certainly not serious breaches of the Code of Professional Responsibility."

### *"8.4 (c) Misconduct*

"This court, having made findings of fact as described above, concludes, by clear and convincing evidence, that Respondent violated Rule 8.4(c).

"Honesty is of paramount importance in the practice of law, *Attorney Grievance Commission v. Ellison,* 384 Md. 688, 867 A.2d 259 (2005). Candor and truthfulness are two of the most important moral character traits of a lawyer, *Attorney Grievance Commission v. Myers,* 333 Md. 440, 635 A.2d 1315 (1994).

"This court concludes that from the point in time where-upon Respondent understood that her parents were going to be sued by BLE on their personal guarantees, she under-took to do whatever she believed it would take to protect her parents' properties; even if that involved fraud, deceit, dishonesty or misrepresentation. Her steps were many and as previously stated, quite labyrinthine.

"With actual knowledge of the impending lawsuit, Re-spondent created a shell business entity as the first step in attempting to defraud BLE by divesting her parents of titled ownership to the properties they owned. This shell was H & K Family Trust, LLC. There was no business purpose or legitimate reason to create this entity.

"Within a day or two, Respondent took the next steps by creating quitclaim deeds and having her parents execute them transferring their entire ownership of the properties to the shell entity for no consideration. Respondent argues that because these transactions were recorded and therefore transparent, they were not fraudulent. This court is per-suaded in no way that the recording of these transactions changes or affects the intent of the Respondent displayed in her actions throughout these unfortunate circumstances.

"Respondent's next step (among others) was to create CACHA, another shell entity. There was no business pur-pose or legitimate reason to create this entity. Respondent then advised and assisted her parents to effect the sale of Summer Fields by H & K to the Zirkins. She created yet another strand in her web by having the proceeds held in escrow for H & K. She then orchestrated the purchase of Autumn Frost by CACHA using the original Summer Fields' funds. She purposely did not have the CACHA deed recorded at that time thereby concealing the transac-

tion. Continuing her efforts, she had her parents send $30,000 of the original Summer Fields funds to a relative, thereby further divesting themselves of this property. She then assisted and/or advised her husband to purchase, in his own name alone, Autumn Frost from CACHA, using her own funds as well as joint funds with her husband in the transaction. Her name, significantly, was never placed on the deed. The Paks, the Respondent, her husband and the family have continued to live in Autumn Frost since CA-CHA purchased it. Through her advice and assistance, she had $196,000 sent to relatives in Korea from the Autumn Frost transaction. She belatedly describes this transaction as a payment of an antecedent debt which is completely unaccepted by this court. At the end of her efforts, her parents were made insolvent by these transactions which certainly hindered and/or prevented BLE in its quest for satisfaction of the obligation guaranteed by the Paks.

"Section 15–207 of the [C]ommercial Law Article of the Maryland Annotated Code provides:

[']Every conveyance and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors.[']

"The indicia of fraud are: the insolvency or indebtedness of transferor; lack of consideration for the conveyance; relationship between the transferor and the transferee; dependency or threat of litigation; secrecy or concealment; departure from the usual method of business; the transfer of the debtor's entire estate; the reservation of benefit to the transferor; and the retention by the debtor of possession of the property. See *Berger v. Hi–Gear Tire and Auto Supply, Inc.*, 257 Md. 470, 263 A.2d 507 (1970). All of these factors are essentially present in this matter, including secrecy or concealment.

"Respondent was an experienced business attorney, well conversant in business transactions and in real estate law. She compounded her deceit and fraud upon BLE by her late

coming allegations of the existence of an antecedent debt by her parents to a relative in Korea. This alleged debt was brought to light later in the litigation and was made to this court, merely to bootstrap her own defense of the fraudulent conveyance claim and the inquiries of the Petitioner herein. Although this court believes that the actions of the Respondent were driven by her love and concern for her parents as well as to protect them from what she felt to be sharp business practices by BLE, her actions regrettably encompassed multiple violations of the code she swore to abide and to uphold."

### "8.4 (d)

"This court, having made findings of fact as described above, concludes, by clear and convincing evidence, that Respondent violated Rule 8.4(d).

"In addition to her intentional acts assisting her parents in their fraud upon the BLE, Respondent's misrepresentation of the facts to Mr. Aronson, to the U.S. District Court, to the Petitioner herein and, for that matter, to this court in her testimony in this unfortunate matter, all represent conduct prejudicial to the administration of justice.

"Conduct which is likely to impair public confidence in the profession, impact the image of the legal profession and engender disrespect for the court is conduct prejudicial to the administration of justice. *Attorney Grievance Commission v. Child[ress]*, 360 Md. 373, 758 A.2d 117 (2000).

"As stated, Respondent utilized her substantial experience and skill to fraudulently thwart the efforts by BLE to satisfy the obligation of her parents. She knew what she was doing and concluded that the ends she sought justified the means she utilized. As the inquiry into her actions got more and more focused and closer to her, she compounded her violations by intentionally failing to disclose substantial and material facts. The web she wove, so finally entangled, completely broke and she found herself in the present situation.

"Her actions and conduct are certainly prejudicial to the administration of justice." [Footnote omitted].

The Commission did not take any exceptions to Judge Martin's findings of fact and conclusions of law. Respondent, however, did file exceptions to Judge Martin's findings, pursuant to Rule 16–758(b).[8] Respondent excepted to each and every conclusion of the Circuit Court and still contends that this Court lacks the jurisdiction to adjudicate the matter.

Respondent also argues that the hearing court should have concluded, on the basis of Mr. Syke's testimony, that there was no fraudulent basis for the formation of the shell entity of H & K, L.L.C. ("H & K") (this was the first of two business entities created by the respondent after the default proceedings from her parents' BLE loan had begun). She notes that creation of H & K was completed at the advice of Henry S. Kim, a C.P.A., and that his professional advice contradicts Judge Martin's conclusion that there was no valid business reason to create H & K. Respondent further contends that there was a legitimate pre-existing debt to Korean relatives and that CACHA, L.L.P. ("CACHA") (the second of the two business entities) was created to facilitate the repayment of this debt. According to an affidavit from a Korean lawyer, provided by respondent, the debt was certified by a promissory note in 1995, several years before the events that led to the case *sub judice* occurred, and that this explanation of the existence of the debt should have been sufficient for the lower court. Respondent takes exception to the lower court's conclusions that for fraudulent reasons she was not named on the title to the Autumn Frost property. She asserts that it is not Korean custom for women to be given title to property.

---

8. Maryland Rule 16–758 provides, in relevant part:
 "(b) **Exceptions; recommendations.** Within 15 days after service of the notice required by section (a) of this Rule, each party may file (1) exceptions to the findings and conclusions of the hearing judge and (2) recommendations concerning the appropriate disposition under Rule 16–759(c)."

Additionally, respondent argues that the Commission failed to satisfy the clear and convincing evidence standard in showing that respondent knew of the United States District Court for the District of Maryland local rule requiring a lawyer to be a member of the Bar of that court in order to file pleadings and, as a consequence, purposely violated the rule. D. Md. Loc. R.102.1.a.ii.[9] Respondent also objects to the finding that she had actual knowledge of her parents' actions regarding the creation of CACHA and the purchase of the Autumn Frost property. Respondent states that she did not intentionally fail to record the deed from the CACHA transaction, rather it was a mistake by a third party title company.

Concerning the finding that the Paks transferred money from the property sales to Korean relatives, respondent objects that there is no evidence to support that she had knowledge of these transfers. Overall, the respondent primarily objects to: (1) the hearing court's non-acceptance of Mr. Syke's conclusions (which were contingent on truth of factual assumptions found by the trial court to be incorrect), (2) that any fraudulent act occurred in conjunction with the creation of the business entities H & K and CACHA, (3) that she had any knowledge of the wire transfers to Korea, and (4) the fact that the Circuit Court came to a conclusion opposite that of the Panel.

Respondent asks this court to accept Mr. Syke's conclusions (expressly conditional on factual assumptions contrary to the facts found by the hearing court) as compared to Judge Martin's conclusions of law, stating that "each and every one of the lower court's conclusions is based on no evidence whatsoever." She argues that the lower court reached unreasonable conclusions regarding MRPC 5.5(a)(b), disregarding

---

9. Local Rule 102.1.a.ii provides:

Parties appearing *pro se.* When a party is appearing *pro se,* the Clerk will accept for filing only documents signed by that party. Attorneys who have prepared any documents which are submitted for filing by a *pro se* litigant must be members of the Bar of this Court and must sign the document, state their name, address, telephone number and their bar number assigned by this Court."

the testimony of Mr. Sykes, and on what she alleges is clear evidence that she never entered an appearance on behalf of her parents before the United States District Court for the District of Maryland. In addition, she notes that Judge Motz, the presiding federal judge, allowed her admission to the Maryland Federal Court Bar during the fraud and conspiracy case. Respondent asks that this Court credit the Panel's findings and conclusions instead of Judge Martin's findings and conclusions.

## II. Standard of Review

In an Attorney Grievance case, we accept the hearing judge's findings of fact, unless they are clearly erroneous. *Attorney Grievance Comm'n v. Guida,* 391 Md. 33, 50, 891 A.2d 1085, 1095 (2006); *Attorney Grievance Comm'n v. Stolarz,* 379 Md. 387, 397, 842 A.2d 42, 47 (2004). This deference to the hearing judge's findings is based in part on the fact finder being in the best position to assess the credibility of a witness. Md. Rule 16–759(b)(2)(B); [10] *Guida,* 391 Md. at 50, 891 A.2d at 1095 ("[t]he fact finder is in the best position to assess the demeanor-based credibility of a witness"); *Attorney Grievance Comm'n v. Sheridan,* 357 Md. 1, 17, 741 A.2d 1143, 1152 (1999) ("Such deference is paid, in part, because [the hearing judge] is in the best position to assess first hand a witness's credibility"). The petitioner has the burden of proving the averments of his or her petition by clear and convincing evidence and a respondent who provides an affirmative defense has the burden of proof by a preponderance of evidence. *Guida,* 391 Md. at 50–51, 891 A.2d at 1095 (citing Md. Rule 16–757(b)).[11]

---

10. Maryland Rule 16–759(b)(2)(B) states:
 "If exceptions are filed. If exceptions are filed, the Court of Appeals shall determine whether the findings of fact have been proven by the requisite standard of proof set out in Rule 16–757(b). The Court may confine its review to the findings of fact challenged by the exceptions. The Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses."

11. Maryland Rule 16–757 states, in relevant part:

■ Although we give deference to the hearing judge's findings of fact, we review the conclusions of law *de novo*. *Attorney Grievance Comm'n v. McLaughlin*, 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002); *Attorney Grievance Comm'n v. Harrington*, 367 Md. 36, 49, 785 A.2d 1260, 1267–68 (2001) ("As to the conclusions of law of a judge, to whom we have assigned hearing duties in an attorney grievance case, our consideration is essentially *de novo* . . . .").

## III. Discussion

### A. Jurisdiction

The respondent argues that this Court does not have jurisdiction to hear the case *sub judice* because, under the Maryland Rules, there is no procedure for the Commission to direct Bar Counsel to file a petition for disciplinary or remedial action. We disagree.

Maryland Rule 16–711 codifies and defines the Attorney Grievance Commission. Of note is subsection (h)(9) of that rule,[12] which provides the authority for the Commission to bring an action against an attorney. Bar Counsel is appointed by the Attorney Grievance Commission and serves with the approval of the Court of Appeals. Md. Rule 16–712(a). Bar Counsel has the authority, subject to the supervision of the Commission, to file and prosecute petitions for disciplinary

---

"(b) **Burdens of proof.** The petitioner has the burden of proving the averments of the petition by clear and convincing evidence. A respondent who asserts an affirmative defense or a matter of mitigation or extenuation has the burden of proving the defense or matter by a preponderance of the evidence."

12. Maryland Rule 16–711(h)(9) provides, in relevant part:

"(h) **Powers and duties.** The Commission has the powers and duties to:

(9) exercise the authority granted in the Rules in this Chapter with respect to the approval or disapproval of (A) the dismissal of a complaint or Statement of Charges, (B) the termination of a complaint with or without a warning, (C) a Conditional Diversion Agreement, (D) a reprimand, or (E) the filing of a Petition for Disciplinary or Remedial Action. . . ."

and remedial actions in the name of the Commission. Md. Rule 16–712(b)(5).

 The Peer Review Panel is established by Maryland Rule 16–742, and the process by which the Panel deliberates is outlined in Maryland Rule 16–743. Of important note here is sub-paragraph (e), stating:

> "(e) **Recommendation.** *The Peer Review Panel may recommend* to the Commission that a Petition for Disciplinary or Remedial Action be filed or make any recommendation to the Commission that Bar Counsel may make under Rule 16–734(a), (b), or (c). The Panel shall accompany its recommendations with a brief explanatory statement."

Md. Rule 16–743(e) (emphasis added). The language of the Rule clearly states that the findings of the Panel are recommendations to the Commission. The Commission is not under any obligation to follow the findings of the Panel.

Moreover, the deliberations, speech, writings, and conduct that occurs before the Panel is confidential, privileged and not subject to discovery. Md. Rule 16–723(a);[13] *See Attorney Grievance Comm'n v. Kinnane*, 390 Md. 324, 335, 888 A.2d 1178, 1185 (2005) (an attorney was disbarred for criminal conduct involving a $70,000 retainer for future work, and the hearing court refused to enter into evidence the report of the Peer Review Panel. We affirmed the hearing court's decision, ruling that the Peer Review Panel's report is indeed confidential).

Lastly, we examine the Commission's authority to bring an action against an attorney. Maryland Rule 16–751(a)(1) provides that: "Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals."

---

**13.** Maryland Rule 16–723 provides in relevant part:

> "(a) **Confidentiality of peer review meetings.** All persons present at a peer review meeting shall maintain the confidentiality of all speech, writing, and conduct made as part of the meeting and may not disclose or be compelled to disclose the speech, writing, or conduct in any judicial, administrative, or other proceeding...."

Respondent argues that the Commission does not have the power to direct Bar Counsel to file a petition for disciplinary or remedial action if the Panel votes to dismiss any charges of professional misconduct. We disagree.

To determine the intent of the Court in adopting a section of the Maryland Rules, this Court has held that we will apply the same methods and principles that we use when analyzing a statute. *Johnson v. State*, 360 Md. 250, 264, 757 A.2d 796, 804 (2000); *see State v. Romulus*, 315 Md. 526, 533, 555 A.2d 494, 497 (1989). "In order to effectuate the purpose and objectives of the rule, we look to its plain text." *Johnson*, 360 Md. at 264, 757 A.2d at 804. Pursuant to this standard of review, it is unnecessary, as the respondent suggests, to look to the legislative history of Maryland Rule 16–751(a)(1). If the language of the rule is plain and unambiguous, then it is not necessary to consider other resources in order to arrive at a meaning for the rule. *Johnson*, 360 Md. at 264–65, 757 A.2d at 804. ("If the words of the rule are plain and unambiguous, our inquiry ordinarily ceases and we need not venture outside the text of the rule."). The language "approval or direction" is clear and unambiguous and we therefore need not consider the Rules Committee report. The Commission may direct Bar Counsel to file a petition against an attorney.

Although the Panel serves a legitimate and important function, its conclusions are merely "recommendations" under the statutory scheme. The language of Maryland Rule 16–743(e) states that "[t]he Peer Review Panel *may recommend ...*" (emphasis added). This language is again clear and unambiguous. A recommendation is mere advice and is not mandatory. By way of example, we held in *Attorney Grievance Comm'n v. Kinnane* that the Panel's findings are only recommendations, stating: "Where there is no more than a recommendatory function, one that is not binding and certainly not dispositive, there is even more reason to 'insulate' Peer Review Panel Reports from subsequent disclosure at later stages of the attorney discipline process." 390 Md. 324, 338, 888 A.2d 1178, 1187 (2005). The Commission was not bound to the

recommendations of the Panel and has the authority to proceed with charges if it so desires.

We have previously held that the content of the Panel's deliberations are confidential. *Id.* at 333–34, 888 A.2d at 1184. Chief Judge Bell, writing for the court, noted:

"[P]ursuant to Maryland Rule 16–723, certain matters pertaining to the Peer Review process are confidential. Section (b)(2) of that Rule list 'the records and proceedings of a Peer Review Panel' as among such matters. The Report of the Peer Review Panel qualifies as records and 'proceedings [that] are confidential and not open to public inspection [whose] contents may not be revealed by the Commission, the staff of the Commission, Bar Counsel, the staff and investigators of the Office of Bar Counsel, members of the Peer Review Committee, or any attorney involved in the proceeding.' "

*Id.* at 336, 888 A.2d at 1185. We also stressed that the deliberations of the Panel are confidential in *Attorney Grievance Comm'n v. Lee*, stating:

"Despite the common sense appeal of permitting use of statements made during the Peer Review process to expose later inconsistencies or intentional misrepresentations, we conclude that the better course is to declaim, borrowing and mutating somewhat a currently popular advertising slogan, 'what happens in Peer Review stays in Peer Review.' "

387 Md. 89, 113, 874 A.2d 897, 911 (2005). This Court has noted that the substance of deliberations discussed by the Panel is confidential and cannot be used in attorney grievance proceedings. The Commission was not under any obligation to follow the advice of the Panel. The Commission was within its authority to direct Bar Counsel to file a Petition for Disciplinary or Remedial Action against an attorney that the Commission believed did not abide by Maryland's Lawyers' Rules of Professional Conduct. This is true regardless of the Panel's recommendations.

■■ The Court of Appeals has original and complete jurisdiction over all attorney disciplinary matters arising from

the conduct of a member of the Maryland State Bar. *Attorney Grievance Comm'n v. Reinhardt,* 391 Md. 209, 220, 892 A.2d 533, 539 (2006) ("[T]his Court has original and complete jurisdiction in attorney discipline matters"); *Attorney Grievance Comm'n v. Maignan,* 390 Md. 287, 292, 888 A.2d 344, 347 (2005) ("Original jurisdiction over attorney discipline matters resides in the Court of Appeals. We determine, ultimately, whether an attorney has committed the misconduct charged by the Attorney Grievance Commission."); *Attorney Grievance Comm'n v. James,* 385 Md. 637, 654, 870 A.2d 229, 239 (2005) ("In proceedings involving attorney discipline, this Court has original and complete jurisdiction"). This Court is the ultimate arbiter of any claims concerning attorney misconduct in the State of Maryland, and the rules and procedures governing an Attorney Grievance action are predicated upon the Court of Appeals having jurisdiction to hear such a case. Therefore, the respondent's assertion that this Court does not have jurisdiction over the case *sub judice,* is without merit.

We reject respondent's view concerning jurisdiction, affirming that the Court of Appeals does indeed have original and complete jurisdiction over all attorney grievance matters within the State of Maryland.

### B. Findings of Fact

 As noted, in an attorney grievance action, this Court will accept the hearing court's findings of fact, unless the findings are clearly erroneous, because the hearing judge is in a better position to assess the bearing and demeanor of witnesses and other evidence. Md. Rule 16–759(b)(2)(B); *Guida,* 391 Md. at 50, 891 A.2d at 1095.

Respondent takes exception to nearly every finding of fact presented by Judge Martin, arguing that there was no fraudulent intention or act that occurred through the creation of H & K and CACHA, the two business entities established by respondent after litigation had begun following the default on her parent's loan. Respondent also notes that she did not know of the Rule requiring a lawyer to be admitted to the Bar of the United States District Court of Maryland, in order to

file therein. She asks this Court to be persuaded by the testimony of an expert witness, Mr. Sykes, who testified on her behalf at trial. Mr. Sykes was of the opinion that if there was a valid antecedent debt paid through the two shell entities, H&K and CACHA, then everything that the respondent did in creating those entities (H&K and CACHA) was not fraudulent. Additionally, respondent asks this Court to be moved by the testimony of a C.P.A., Kim, who advised her on the creation of the shell entities, stating that they were created for tax shelter purposes. We are not persuaded.

After hearing trial testimony and reviewing the evidence presented, Judge Martin, in a comprehensive manner, made his findings of fact in this case. Respondent has failed to demonstrate the existence of factual inconsistencies that should tip the scale in her favor. Therefore, this Court accepts the findings of fact by the hearing court, without modification or amendment. Respondent's exceptions are denied.

## C. Conclusions of Law

As a rule, this Court reviews the hearing judge's conclusions of law *de novo*. *Attorney Grievance Comm'n v. Reinhardt*, 391 Md. 209, 221, 892 A.2d 533, 539 (2006). Judge Martin found that respondent violated Rules 3.3, 4.1, 5.5, 8.4(c) and 8.4(d) of the MRPC. We shall analyze each alleged infraction.

### 1. MRPC 3.3

MRPC 3.3(a)(1) and (2) state: "(a) A lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal; (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client. . . ." An attorney must at all times display candor with the truth towards a tribunal or inquiry board. *Attorney Grievance Comm'n v. Kapoor*, 391 Md. 505, 531, 894 A.2d 502, 518 (2006) (attorney was disbarred for a series of violations, including misrepresenting material facts to a bankruptcy court); *Attorney Grievance Comm'n v. Kent*, 337 Md. 361, 371, 653 A.2d 909, 914 (1995) (an attorney

was found to show a lack of candor before a tribunal, when it was revealed in a subsequent inquiry that he was not truthful to the trial court).

Judge Martin found through clear and convincing evidence that the respondent had violated MRPC 3.3(a)(1) and (2). He found that respondent was not truthful to the trial court in her statements under oath. This was based on respondent's admission in her testimony in the United States District Court for the District of Maryland (this testimony occurred during the second of the two cases that the respondent was involved in, *Business Loan Express, LLC v. Hekyong Pak,* No. Civ. JFM–04–634, 2004 WL 1554395, slip op. at 1–2 (D.Md. Jul.9, 2004)) that money was transferred to Korea from the proceeds of the sale of Summer Fields (the first property that the Pak family sold, in July, 2003) when she knew that was not true. In fact, the funds were wired after the second property sale (the Autumn Frost property). Respondent also failed to disclose the source of the funds that were used to purchase Autumn Frost (the property that was bought after the sale of Summer Fields, and was subsequently sold to respondent's husband).

Respondent objects to this conclusion by asserting that the hearing court's conclusions are improper, based on the evidence presented and suggests that this Court accept the conclusions of expert witness Sykes (which were based on a factual predicate contrary to that which the hearing court ultimately found), rather than Judge Martin's conclusions. Respondent, however, does not directly address the conclusions of the hearing court.

We agree with the hearing court that the respondent violated these rules. We arrive at this conclusion through the facts that have been accepted in this case and because respondent has provided an insufficient rebuttal argument concerning the land sale and transfer of funds to Korea. Candor towards the tribunal is a necessity in the practice of law, and as a consequence of her actions and intentional failures to disclose we hold that the respondent violated MRPC 3.3(a)(1) and (2).

## 2. MRPC 4.1

■ MRPC 4.1 exists to insure that attorneys will honestly represent the facts when in discussions with a third party. An intentional misrepresentation of a material fact that is made to opposing counsel may constitute a violation of MRPC 4.1. *Attorney Grievance Comm'n v. Steinberg*, 395 Md. 337, 367, 910 A.2d 429, 446 (2006); *Attorney Grievance Comm'n v. Barneys*, 370 Md. 566, 589, 805 A.2d 1040, 1052–53 (2002) (attorney misled a third party concerning representation of a worker's compensation action).

The hearing court found, through clear and convincing evidence, that respondent was in violation of MRPC 4.1(a)(1) and (2). Judge Martin found that respondent failed to correct BLE's (the loan company bringing the default action) assertion in its original lawsuit that the funds were wired to Korea from the Summer Fields settlement, when in fact the funds were sent after the sale of the Autumn Frost property. This was a material omission on the part of the respondent, as she knowingly allowed opposing counsel to rely upon an incorrect record. Additionally, respondent admitted under oath that the funds were wired to Korea through the Summer Fields settlement and this admission was untrue. Again, opposing counsel relied on this statement.

Respondent argues, unconvincingly, that the Commission has not met its burden of proof in this case. She also argues that no perjury charges were filed against her for any misrepresentations in the pleadings.

While the filing of perjury charges, and/or conviction of same, may well be relevant in the context of attorney disciplinary proceedings, the failure to file such charges is not conclusive, and is of much less relevance. Perjury may, generally, consist of misrepresentations, but not all misrepresentations are perjurous and not all perjurous misrepresentations will cause a prosecutor to initiate perjury charges.

MRPC 4.1(a)(1) and (2) expressly forbids conveying a false statement or failing to disclose a material fact to a third party. We hold that respondent's conduct constituted a violation of

this rule. Her misrepresentations and false statements were intentional and were made in order to mislead opposing counsel. These false statements and omissions of fact were relied upon by opposing counsel during litigation.

### 3. MRPC 5.5

■■■ MRPC 5.5 provides that a lawyer shall not practice law in a jurisdiction in violation of the rules of that jurisdiction. *Attorney Grievance v. Velasquez*, 380 Md. 651, 846 A.2d 422 (2004) (in which a Maryland attorney was disbarred for practicing law in Virginia without being admitted to the Virginia bar); *Attorney Grievance Comm.'n v. Alsafty*, 379 Md. 1, 19, 838 A.2d 1213, 1224 (2003) (in which a New York attorney was disbarred for practicing law in Maryland without being admitted to the Maryland bar). Furthermore, an attorney in Maryland is required to know the rules of professional conduct. *Attorney Grievance Comm'n v. Awuah*, 346 Md. 420, 435, 697 A.2d 446, 454 (1997).

The pertinent local rules of the United States District Court for the District of Maryland that respondent allegedly violated are:

"**Rule 102. General filing and service requirements.**

**1. Signatures, identifying information and proof of service.**

a. Signatures i. Parties represented by counsel. When a party is represented by counsel, the Clerk shall accept for filing only documents signed by a member of the Bar of this Court whose appearance is entered on behalf of that party. Use of any of the methods for signing an electronic document established by the Court, including use of an attorney's login and password to electronically file a document, constitutes the attorney's signature on the document.

ii. Parties appearing *pro se*. When a party is appearing *pro se*, the Clerk will accept for filing only documents signed by that party. Attorneys who have prepared any documents which are submitted for filing by a *pro se* litigant must be members of the Bar of this Court and must sign

the document, state their name, address, telephone number and their bar number assigned by this Court."

D. Md. Local Rule 102.1.a.i and ii.

Judge Martin's conclusion that respondent violated MRPC 5.5 was based on two actions by respondent. In the first occurrence of the violation, respondent, on behalf of her parents, prepared a motion to dismiss (for the first, loan default case, *Business Loan Express, LLC v. Hosurl Pak,* No. Civ. JFM–03–1691, slip op. at 1 (D.Md. Dec. 9, 2003)) in United States District Court for the District of Maryland, Northern Division. In so doing, she was in actual violation of D. Md. Local Rule 102. 1.a.ii, which arguably requires that when a *pro se* filing is made with the aid of an attorney, that attorney must be a member of the bar. Subsequently, she filed a motion in her own name (for the second, fraud case, *Business Loan Express v. Hekyong Pak,* No. Civ. JFM–04–634, 2004 WL 1554395, slip op. at 1–2 (D.Md. Jul.9, 2004)), again without being admitted to the bar in violation of D. Md. Local Rule 102. 1.a.i. Although Judge Motz later admitted her to the bar of the Federal District Court, she was not so admitted at the time of both of these actions.

Respondent claims that there is a difference between the unauthorized practice of law and an unauthorized appearance in a court where one has not been formally admitted. She also claims that because Judge Motz allowed her to become a member of the United States District Court for the District of Maryland Bar, that these prior appearances are irrelevant. We disagree.

Maryland's courts and the United States District Court for the District of Maryland are jurisdictionally distinct. By her actions, respondent violated the legal practice rules of another jurisdiction. When this fact is coupled with a plain language reading of the local rule of the federal district court and the MRPC, respondent is found to be in violation of MRPC 5.5 because of her unauthorized practice of law in the federal court. We hold that respondent was in violation of MRPC 5.5, regardless of whether she knew of the local federal court

rules, and regardless of the fact that Judge Motz eventually admitted her to the federal bar.

### 4. MRPC 8.4(c)

 MRPC 8.4(c) provides that it is professional misconduct for an attorney to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." A lawyer must at all times accurately represent the facts. *Attorney Grievance Comm'n v. Ellison,* 384 Md. 688, 711, 867 A.2d 259, 272 (2005) (an attorney who misrepresented his representation of a client was found to be in violation of 8.4(c) and was ordered disbarred). Willfully providing false information in a deposition or in courtroom proceedings is a clear violation of the rule. *Attorney Grievance Comm'n v. White,* 354 Md. 346, 364, 731 A.2d 447, 457 (1999) (an attorney who gave false testimony in a deposition and as a witness was found in violation of 8.4(c) and ordered disbarred). Candor and truthfulness are two of the most important moral character traits of a lawyer. *Attorney Grievance Comm'n v. Myers,* 333 Md. 440, 449, 635 A.2d 1315, 1319 (1994).

Judge Martin concluded that respondent undertook fraudulent actions in order to protect her parents and their assets and thus violated MRPC 8.4(c). He found that her actions to create shell business entities (H & K, L.L.C. and CACHA, L.L.P) had no legitimate business purposes and were used to transfer title to the Pak's properties, without consideration. The evidence before the hearing court was sufficient for Judge Martin's conclusions. The hearing court also noted that respondent advised her parents when to send the funds to Korea and orchestrated the purchase of the Autumn Frost property in her husband's name only. Lastly, the hearing court found that the Respondent's actions were within the definition of fraud, as outlined in Maryland Code (1975, 2005 Repl.Vol.), § 15–207 of the Commercial Law Article.[14]

---

**14.** Maryland Code (1975, 2005 Repl.Vol.), § 15–207 of the Commercial Law Article provides:

Respondent asserts that there can be no misconduct, because her actions were not fraudulent. Again, respondent asks us to consider the testimony of her expert witness, Mr. Sykes, and disregard the findings of the hearing court. Moreover, the respondent contends that the business entities were created for legitimate, tax related purposes.

We accept Judge Martin's findings and conclusions on this issue and hold that the respondent did violate MRPC 8.4(c), because there is clear and convincing evidence that her actions were an effort to delay, hinder, or defraud her parents' creditors. Actions by an attorney that constitute fraud, dishonesty, deceit or misrepresentations constitute an egregious violation of the MRPC. There is ample evidence to conclude that respondent made material misrepresentations concerning her actions on behalf of her parents. Although no specific intent is needed to prove a misrepresentation, in these proceedings the misrepresentations were intentional. *Attorney Grievance Comm'n v. Pennington,* 387 Md. 565, 590, 876 A.2d 642, 657 (2005) (attorney was disbarred for 8.4(c) misrepresentations, which she blamed on her counsel). Moreover, respondent's creation of shell business entities and the subsequent title transfers were an effort to hinder BLE in its quest to collect on a judgement against her parents. Combined with the misrepresentations of fact, these fraudulent acts constitute an egregious violation of MRPC 8.4(c).

### 5. MRPC 8.4(d)

It is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." MRPC 8.4(d). An attorney who fails to respond truthfully brings the legal profession into disrepute and is therefore acting in a manner prejudicial to the administration of justice. *Attorney Grievance Comm'n v. Rose,* 391 Md. 101, 111, 892 A.2d 469, 475 (2006); *Attorney Grievance Comm'n v.*

---

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors."

*Childress,* 360 Md. 373, 381–82, 758 A.2d 117, 121 (2000) (case was remanded, but the court noted that conduct which is likely to impair public confidence in the profession, impacts the image of the legal profession and engenders disrespect for the Court is conduct prejudicial to the administration of justice). The hearing court concluded by clear and convincing evidence that respondent's conduct also constituted a violation of MRPC 8.4(d). By creating shell business entities in order to defraud creditors and conveying misrepresentations of facts to opposing counsel, the United States District Court for the District of Maryland and petitioner, respondent committed acts that were prejudicial to the administration of justice. Respondent does not directly rebut these conclusions. Instead she again argues that the hearing court was incorrect on the findings of fact that led to this conclusion of law. We accept Judge Martin's extensive and well reasoned findings and conclusions.

We hold that respondent's conduct was prejudicial to the administration of justice, constituting a violation of MRPC 8.4(d). Respondent used her knowledge of the law to mislead and defraud her parents' creditors. Her misrepresentations of the facts were relied upon by opposing counsel and her actions to divest her parents' assets hindered the collection of funds from the judgment rendered by the United States District Court for the District of Maryland. In *Attorney Grievance Comm'n v. Sheinbein,* we described the effect such actions have on the legal profession: "When an officer of the legal system improperly thwarts the mechanisms within it, he shows a disrespect for that system and the public confidence in the legal profession as a whole necessarily suffers a devastating blow." 372 Md. 224, 254–55, 812 A.2d 981, 998 (2002).

## V. Sanctions

We now turn to the question of sanctions for these serious violations of the Maryland Rules of Professional Conduct. The sanctions for a violation of the MRPC depend on the facts and circumstances of each case, and any mitigating circumstances. *Attorney Grievance Comm'n v. Reinhardt,*

391 Md. 209, 223, 892 A.2d 533, 541 (2006). When delivering the appropriate sanction, we are guided by our interest in protecting the public and inspiring confidence in the legal profession. *Attorney Grievance v. Pennington,* 387 Md. 565, 595, 876 A.2d 642, 660 (2005). The purpose of attorney disciplinary proceedings is to protect the public and guide other lawyers away from violating the MRPC, not to punish the lawyer. *Reinhardt,* 391 Md. at 223, 892 A.2d at 541.

Bar Counsel suggests that the appropriate sanction in this case is disbarment because respondent engaged in a "web of lies" and undertook any means necessary to protect her parents' assets, "even if it involved fraud, deceit, dishonesty, or misrepresentation." Respondent does not make a recommendation for sanctions.

Bar Counsel notes that there are no credible extenuating circumstances in this case and that Judge Martin found through clear and convincing evidence that respondent had engaged in intentionally dishonest behavior and conducted herself fraudulently in order to thwart a creditor's attempts to collect on a judgment. We agree with these findings. These multiple violations of the MRPC are egregious. The sanction must be disbarment.

There is ample precedent for disbarment based on these violations. Honesty and proper representations of the facts are essential in the practice of law. In the case before us, respondent intentionally misled opposing counsel, the hearing court, and her parents' creditors. *Attorney Grievance Comm'n v. Ellison,* 384 Md. 688, 714, 867 A.2d 259, 275 (2005) (disbarment is the appropriate sanction for an attorney, if that attorney was intentionally dishonest in dealings with a third party); *Attorney Grievance Comm'n v. Blum,* 373 Md. 275, 304, 818 A.2d 219, 237 (2003) (disbarment is also appropriate when an attorney has made multiple representations in an attempt to obfuscate the truth in order to save him or her self).

This Court observed in *Attorney Grievance Comm'n v. Vanderlinde,* that "[u]nlike matters relating to competency,

diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse." 364 Md. 376, 418, 773 A.2d 463, 488 (2001). Every attorney in the State of Maryland has sworn or affirmed an oath to abide by the rules and laws of this State. Respondent's conduct in the case *sub judice* was dishonest, misleading, fraudulent and prejudicial to the administration of justice.

We thus ORDER that Hekyong Pak a/k/a H. Christina Pak be disbarred.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THE COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF ATTORNEY GRIEVANCE COMMISSION AGAINST HEKYONG PAK A/K/A H. CHRISTINA PAK.**

WILNER, J., concurs and dissents which BELL, C.J., RAKER, J. and GREENE, J., join in the concurrence.

WILNER, J., which BELL, C.J., RAKER and GREENE, JJ., join.

I concur in the decision to disbar Ms. Pak, and, with one exception, I agree with the analysis set forth in the lead Opinion leading to that result. My only concern is with the treatment in that Opinion of the alleged violation of MRPC 5.5(a), which prohibits a lawyer from "practic[ing] law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction." The lead Opinion would affirm a finding that Ms. Pak violated that Rule by (1) preparing a motion to be filed by her parents *pro se* in the U.S. District Court for the District of Maryland, and (2) subsequently filing in that court an answer to a complaint against her and a family trust, both at a time when she had not been formally admitted to the Bar of that court in conformance with Local Rule 701 of the court. I disagree with that conclusion.

To the best of my knowledge, this Court has never before addressed whether an attorney who is a member in good standing of the Bar of this Court and who is therefore lawfully permitted to practice law in this State is in violation of MRPC 5.5(a) if he or she prepares or files pleadings or motions or otherwise appears in the U.S. District Court for the District of Maryland without having been formally admitted to the Bar of that court. This is an important issue.

One may start with the plain words of the Rule. MRPC 5.5(a), as noted, precludes a lawyer from practicing law "in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction...." The lead Opinion bases its finding of violation on the simplistic premise that "Maryland's courts and the United States District Court for the District of Maryland are jurisdictionally distinct" and that "[b]y her actions, respondent violated the legal practice rules of another jurisdiction." Other than to discuss whether what Ms. Pak did constituted the practice of law, that is the extent of the analysis.

Obviously, the Federal courts are jurisdictionally distinct from the State courts, but I do not believe that MRPC 5.5(a) uses the term "jurisdiction" in that context. It speaks of practicing law "*in* a jurisdiction," in violation of the regulation of the legal profession "*in* that jurisdiction." (Emphasis added). That, to me, indicates a geographic context, not one of dual judicial sovereignty within the same State. The prohibition is against practicing law in another State (or District or territory, or perhaps even country, which, for simplicity, I will characterize as a State) in violation of the rules in that State. An unauthorized appearance as an attorney in a Federal court located in such a State *would* constitute a violation of Rule 5.5(a), but the violation would not be founded on the fact that the appearance was in a Federal court to which the attorney had not been admitted but on the fact that the appearance as counsel would constitute the practice of law *in that State.* The U.S. District Court for the District of Maryland, though not part of the Maryland judiciary, is not in a separate geographic enclave. It is in the State of Maryland, and Ms.

Pak was at all relevant times admitted to practice law "in that jurisdiction."

To illustrate the point, Ms. Pak could have entered the Federal courthouse in Baltimore or Greenbelt and, subject to security and decorum constraints imposed by the court or the U.S. Marshals, sit in the lobby or other available space and draft pleadings or legal memoranda, consult with clients, negotiate settlements, and do a variety of other things that would constitute the practice of law. A lot of law is practiced in the corridors, lobbies, and rest rooms in the courthouse. None of that would violate MRPC 5.5(a), even if the conduct pertained to a case pending in the Federal court, because it all would have occurred in Maryland. She could not, however, have done the same thing in some other State where she was not admitted to practice. The Rule is plainly founded on geographic boundaries, which is implicit not only from its wording but from its deeper jurisdictional underpinning.

Subject to Federal Constitutional constraints, the regulation of the practice of law in the United States has long and generally been regarded as a State matter. The basic qualifications for admission to the Bar—graduation from an accredited law school, successful completion of a State-administered Bar examination, real proof of good moral character, and, in some States, completion of a professionalism course—are established by the legislative or judicial authorities of the respective State Governments, and it is the State judicial authority that determines whether those qualifications have been met. In most States, the State Supreme Court determines who may practice law in the State, which it does by formally admitting qualified candidates to practice within the geographic confines of that State. Ordinarily—and this is certainly true in Maryland—a lawyer admitted to practice by that court may not only practice in any of the courts of the State but may engage in the practice of law without ever setting foot in any courthouse.

Most, if not all, of the 94 U.S. District Courts in the country honor that State role by making any lawyer admitted to

practice by the highest court of the State in which the District Court is located eligible for admission to the Bar of that court. Many, indeed, like the District Court for the District of Maryland, make a lawyer admitted by the highest court of *any* State so eligible. With an important exception noted below, the additional requirements for admission to the Bar of a Federal court are generally rather minimal and mostly procedural. Although they tend to require that the attorney be familiar with Federal rules of civil and criminal procedure, the local rules of the court, and the Federal Rules of Evidence, they do not ordinarily require the successful completion of a Federal Bar examination or place any additional requirements on the nature or extent of the attorney's legal education or experience. In that important sense, the Federal courts themselves recognize the primacy of the States in regulating the practice of law.[1]

Until now, our jurisprudence under MRPC 5.5(a) has been limited to two categories of persons: (1) those who improperly practice law in Maryland without having been admitted to practice here by this Court, and (2) those who are admitted to practice in Maryland but improperly practice in another State without having been admitted by that State to do so. The two cases relied on in the lead Opinion—*Attorney Grievance v. Velasquez*, 380 Md. 651, 846 A.2d 422 (2004) and *Attorney Grievance v. Alsafty*, 379 Md. 1, 838 A.2d 1213 (2003)— involved one or the other of those situations. Velasquez was a Maryland attorney who was disciplined under MRPC 5.5 for unlawfully practicing in Virginia when he was not admitted to practice in that State. Alsafty was a New York attorney who practiced in Maryland when he was not admitted to do so.[2]

---

**1.** It is certainly questionable from this construct whether the local rules governing the admission of lawyers to the Bar of the Federal courts can be said to constitute "the regulation of the legal profession," for purposes of MRPC 5.5(a).

**2.** Alsafty practiced for a brief period in the U.S. District Court for the District of Maryland prior to his admission by that court, but the violation of MRPC 5.5 was based on his unauthorized practice in Maryland, which was extensive, not on his appearance in the Federal

When we apply MRPC 5.5(a) in those manners, we implement our own role in regulating the practice of law in Maryland and gratify the legitimate role of our sister States in regulating the practice of law within their respective borders.

So far, the interplay with the Federal courts in the context of MRPC 5.5(a) has involved a converse situation. Following the pronouncement of the Supreme Court in *Sperry v. Florida*, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963), we have concluded that an attorney not admitted to practice law in Maryland does *not* violate MRPC 5.5 by practicing, even from a Maryland office, *exclusively* in Federal court or before a Federal agency, if, under Federal law or the rules of the Federal court, the lawyer is authorized to practice before that agency or court. *See Attorney Grievance v. Bridges,* 360 Md. 489, 759 A.2d 233 (2000) but compare *Attorney Grievance v. Harris–Smith,* 356 Md. 72, 737 A.2d 567 (1999) and *c.f. Kennedy v. Bar Ass'n,* 316 Md. 646, 561 A.2d 200 (1989); *Attorney Grievance v. Barneys,* 370 Md. 566, 805 A.2d 1040 (2002).

That precept is based on the Supremacy Clause—that a State may not, through a Rule such as MRPC 5.5, preclude a person from practicing before a Federal court or agency if Federal law permits the person to do so. It does not necessarily follow, however, at least under a Supremacy analysis, that MRPC 5.5 is violated when a lawyer admitted to practice in Maryland acts as counsel in the U.S. District Court here without having been admitted to that court's Bar.

There have been but a few cases that have even tangentially dealt with the issue now before us, and they provide no enlightened analysis. In *Office of Disciplinary Counsel v. Scuro,* 36 Ohio St.3d 205, 522 N.E.2d 572 (1988), an attorney admitted in Ohio applied for admission to practice before the

court on behalf of indigent clients. The unauthorized Federal court activity was noted in rejecting Alsafty's defense that, even though not admitted in Maryland, it was permissible for him to practice in Federal court. Obviously, that defense had no basis if he had not been admitted to practice in the Federal court.

U.S. District Court for the Western District of Texas, which required as a condition of admission that the lawyer pass a Federal bar examination of some kind. The lawyer failed the examination and was therefore not admitted. Nonetheless, over a period of four years, he proceeded to represent about thirty clients before that court. When that was discovered, the District Court held the lawyer in contempt. That, in turn, led to a disciplinary proceeding in Ohio. In a one-paragraph *per curiam* opinion, the Ohio Supreme Court concluded that the lawyer's conduct violated not only the Rules of the Federal court but also the Texas Code of Professional Responsibility and the Rules of the Texas Supreme Court governing the practice of law, and that it warranted a six month suspension. None of those rules were cited, and it is not clear from the summary opinion whether the violation was founded on Scuro's unauthorized practice in the State of Texas or specifically on his appearance in the Federal court in that State.

*In re Pryor,* 864 So.2d 157 (La.2004) involved a Louisiana attorney who faced multiple charges, mostly involving lack of diligence and failure to cooperate with Disciplinary Counsel. One of the charges arose from the attorney's representation of a client in a probation revocation matter in the U.S. District Court when he had not taken the necessary steps to be admitted to practice in that court. In regard to that issue, the hearing committee "observed that, although respondent may have engaged in the unauthorized practice of law in federal court, any violation was only technical in nature." Other than mentioning the hearing committee's conclusion, the court, itself, gave no further attention to the matter but suspended the attorney for the other violations.

In *In re Schoeneman,* 891 A.2d 279 (D.C.2006), an attorney whose license to practice law had been revoked in Virginia, his home State, and, on a reciprocal basis, was suspended in the District of Columbia and by the U.S. District Court in D.C., provided legal advice to and drafted pleadings for three clients with respect to matters before the U.S. District Court. The real gravamen of the charges ultimately brought against him involved the neglect of those clients and his failure to inform

them of his suspension, but he was also charged with a violation of Rule 5.5. The D.C. hearing committee and the Board on Professional Responsibility found no violation of that Rule, essentially on the ground that the services provided by Schoeneman during his suspension did not constitute the practice of law. The D.C. Court disagreed with that conclusion and held that the attorney's conduct *did* constitute the practice of law, at a time when he "had been suspended from practice in every jurisdiction in which he had been admitted." *Id.* at 281. Schoeneman, in other words, was not authorized to practice at all, in *any* court located in the District of Columbia.

On this scant authority and given the actual wording of MRPC 5.5, it is a real stretch to construe that Rule as applying separately to practice in a Federal court, and it is not necessary for the purity and preservation of the legal profession to make that stretch. For one thing, our colleagues in the U.S. District Court are fully capable of dealing with attorneys who attempt to practice in their court without being properly admitted to do so. *See* U.S. District Court Local Rules 703–705. They do not need a strained construction of MRPC 5.5 for that purpose. Nor do we; there are other ways that this Court can deal with that situation.

In addition to the more routine qualifications common in the admission rules of many Federal courts, Local Rule 701 of the U.S. District Court for the District of Maryland requires, as a condition of admission to practice before that court, that the attorney be "willing, available and competent to accept appointments by the Court to represent indigent parties in civil cases in this District unless the acceptance of such appointments is inconsistent with an attorney's professional employment obligations as, for example, a government attorney." When an attorney knowingly proceeds to practice in that court without being admitted, and thereby seeks to escape the obligation of *pro bono* service that the court has made a condition of such admission, the attorney may well be in violation of MRPC 6.1(a), 6.2, and 8.4(d). MRPC 6.1(a) provides that a lawyer "has a professional responsibility to render pro bono publico legal service." Rule 6.2 adds, even more

pointedly, that a lawyer "shall not seek to avoid appointment by a tribunal to represent a person except for good cause ..." Rule 8.4(d), of course, makes it professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice.

That approach, it seems to me, is a better way to address the problem, for it focuses on the deceptiveness of the lawyer and the effect of that deceptiveness on the lawyer's obligations under Rules 6.1 and 6.2, rather than on a strained construction of the word "jurisdiction" in MRPC 5.5 and a blurring of the predominant role of the States in regulating the practice of law. In that latter regard, it also avoids the prospect of a lawyer duly admitted to practice by this Court facing criminal liability under Maryland Code, § 10–601 of the Bus. Occ. & Prof. Article for practicing in the Federal court without having been admitted under Local Rule 701.[3]

For all of these reasons, I would not find a violation of MRPC 5.5. I am authorized to announce that Chief Judge Bell and Judges Raker and Greene join in this Opinion.

---

**3.** Section 10–601 provides that, "[e]xcept as otherwise provided by law, a person may not practice, attempt to practice, or offer to practice law in the State unless admitted to the Bar." Section 10–101(d) defines "Bar" as the Bar of this Court, "unless the context requires otherwise." If this Court were to hold that practice in the U.S. District Court for the District of Maryland without being admitted to the Bar of *that* court constitutes the unauthorized practice of law under MRPC 5.5, the claim could be made that such practice constitutes the practice of law "in the State" without being "admitted to the Bar" in violation of § 10–601. Violation of that statute is a misdemeanor that carries a one-year jail sentence and a fine of $5,000. *See* § 10–606(a)(3).