9 A.3d 37

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

**v.**

**Christopher Allen PALMER.**

**Misc. Docket AG No. 49, Sept. Term, 2009.**

Court of Appeals of Maryland.

Nov. 30, 2010.

James P. Botluk, Asst. Bar Counsel (Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland), for petitioner.

Christopher Allen Palmer, Esquire, of Berlin, Maryland, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and BARBERA, JJ.

HARRELL, J.

The Attorney Grievance Commission ("Petitioner"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action against Christopher A. Palmer ("Respondent"), charging him with professional misconduct in violating various provisions of the Maryland Rules of Professional Conduct ("MRPC"), the Maryland Rules, and the Business Occupations & Professions Article of the Maryland Code. Specifically, Petitioner charged that Respondent violated the following Rules of Professional Conduct: 1.1 (competence);[1] 1.15(a), (c) (safekeeping property);[2] 8.4(b), (c), (d);[3] Maryland

---

1. MRPC 1.1 provides that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

2. MRPC 1.15 provides, in pertinent part:

 (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of

Rule 16–609 (prohibited transactions); [4] and Maryland Code (2000, 2010 Repl.Vol.), Business Occupations & Professions Article, § 10–306 (misuse of trust money).[5] Pursuant to Maryland Rules 16–752(a) [6] and 16–757(c),[7] we referred the case to the Honorable Brett W. Wilson of the Circuit Court for Dorchester County for the conduct of an evidentiary hearing and the preparation of findings of fact and recommended conclusions of law. Judge Wilson conducted the evidentiary hearing on 30 March 2010. He issued his written findings of

---

other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of representation.

\*　\*　\*　\*　\*　\*

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred.

\*　\*　\*　\*　\*　\*

3. MRPC 8.4 provides, in pertinent part, that "[i]t is professional misconduct for a lawyer to ... (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice."

4. Rule 16–609 provides, in pertinent part, that "[a]n attorney or law firm may not borrow or pledge any funds required by the Rules in this Chapter to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose."

5. Maryland Code (2000, 2010 Repl.Vol.), Business Occupations & Professions Article, § 10–306 provides that "[a] lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer." The language of this statute in 2008—when the misconduct occurred—was the same as it exists today.

6. Maryland Rule 16–752(a) provides, in pertinent part that, "[u]pon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record."

7. Maryland Rule 16–757(c) provides, in pertinent part, that "[t]he judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law."

fact and conclusions of law on 6 May 2010. As we cannot envision a better way for the arc of this case to unfold, we intend to flatter Judge Wilson by relating verbatim here his findings and conclusions.

## I.

### Findings of Fact[8]

#### A. Respondent's Background

Respondent graduated from the University of Maryland School of Law in 1998 and was admitted to the Maryland Bar on December 16, 1998. Following graduation, Respondent served as Law Clerk to the Honorable Daniel M. Long, Circuit Court for Somerset County, Maryland, from 1998 until August 1999. Upon the conclusion of his judicial clerkship, Respondent joined the law firm of Ayres, Jenkins, Gordy & Almand, P.A. ("the Firm") in Ocean City, Maryland. Respondent was an associate in the Firm from September 1999 until December 2008. Since leaving the Firm, Respondent has continued to provide legal services as a solo practitioner, focusing his work primarily in the area of family law. Respondent also handles criminal cases as a panel attorney for the Office of the Public Defender.

Respondent married his wife, Stacie, in 2004. The couple has two children, the first born in 2006 and the second born in 2009. In addition to the time Respondent spends with his family, Respondent is also very active in professional and community organizations. Respondent has served on the Board of Directors for Worcester Youth and Family Counseling Services, Inc. since 2000 and became President in September 2008. Respondent has served as Treasurer, Secretary, and, most recently, Vice President of the Worcester County Bar Association. Since 2005, Respondent has

---

8. Flattery aside, all internal citations to Petitioner's Exhibit # 1 below (the parties' stipulation of facts)—the only documentary exhibit cited in the hearing judge's findings and conclusions—have been omitted. All other citations and footnotes appearing in this opinion, associated with the findings of fact and conclusions of law, are those of this Court.

served as the Circuit Coordinator for the First and Second Circuits of the Maryland State Bar High School Mock Trial Competition. Respondent previously served as the First Circuit Representative in the Young Lawyers Section of the Maryland State Bar Association. Respondent also volunteers in the Circuit Court for Worcester County, conducting settlement conferences in civil cases.

## B. Finding of Facts Regarding Respondent's Alleged Misconduct

The facts underlying the alleged violations are undisputed. In anticipation of the evidentiary hearing, Petitioner and Respondent stipulated to certain facts which were reduced to writing and admitted into evidence. . . .

### (1) Misuse of Escrow Funds

In 2008, the Firm was considering whether to offer Respondent Partner status. As discussed more fully below, Respondent transferred funds belonging to clients Royalton Motor Hotel, LLC, Garrison Smith, and Dennis Bellehumeur from the Firm's escrow account to the general account and had those funds credited to himself for billing purposes. Respondent made these monetary transfers in order to make it appear that his collected fees were higher than they actually were so as to improve his prospects of being offered a partnership interest in the Firm.

When the Firm discovered Respondent's improper transfer of client funds from the escrow account to the general account, the Firm deposited funds back into the escrow account so that the clients sustained no loss. The Firm adjusted its compensation to Respondent to recover the funds overpaid to him.

### (a) *Royalton Motor Hotel, LLC v. Pacific Surfwear, Inc., et al.*

On July 18, 2007, Respondent obtained a judgment in favor of his client, Royalton Motor Hotel, LLC, in the Circuit Court for Worcester County, Maryland, in case number 23–C06–001305 CN in the amount of $28,781.97.

On August 2, 2007, Respondent received $2,000.00 as partial payment of the judgment in factor of Royalton Motor Hotel, LLC and deposited the money in the Firm's escrow account. Additionally, the Firm received three money orders, each in the amount of $1,000.00, which were received as further payment from the debtor and deposited in the Firm's escrow account on October 16, 2007. The Firm did not immediately disburse the $5,000.00 collected on behalf of Royalton Motor Hotel, LLC to its client. No explanation was provided for the delay.

On June 30, 2008, Respondent disbursed $5,000.00 from the Firm's escrow account and deposited those funds in the Firm's general account. To accomplish this transfer of funds, Respondent wrote escrow check number 17956 payable to the Firm. Respondent referenced an unrelated client file number, ending in the letter "P", which indicated that the funds pertained to a fee earned in a matter involving a client brought to the Firm by Respondent.

At this time, Respondent received an annual salary of $50,000.00. He also received one-third of all fees generated by clients he brought to the Firm. As a result of Respondent's transfer of Royalton Motor Hotel, LLC's $5,000.00 from the Firm's escrow account to its operating account, and his designation of those funds as pertaining to an unrelated client originated by him, Respondent received one-third of the funds ($1,666.50) as part of his compensation from the Firm for June 2008.

After the Firm discovered that Respondent had improperly transferred these funds to the general account, the Firm returned the $5,000.00 to its escrow account, disbursed $4,000.00 to its client, and paid the proper fee of $1,000.00 to the Firm in December 2008. The Firm adjusted its compensation to Respondent to recover the funds overpaid to him.

### (b) *Garrison Smith and Dennis Bellehumeur v. Daniel Troiano*

Respondent also handled a collection case for the Firm's clients, Garrison Smith and Dennis Bellehumeur. He ob-

tained a judgment in the amount $6,023.68. On June 13, 2008, Respondent received $1,000.00 towards the judgment on behalf of Smith and Bellehumeur. At Respondent's direction, those funds were deposited in the Firm's escrow account. On July 10, 2008, Respondent received additional payment of $500.00 on account of said judgment. The firm deposited these funds in the Firm's general account. On July 31, 2008, Respondent received an additional $1,000.00, which was properly deposited in the Firm's escrow account. On August 21, 2008, Respondent received $500.00 on behalf of Smith and Bellehumeur, which was deposited in the Firm's general account.

On September 30, 2008, Respondent wrote a check drawn on the Firm's escrow account in the amount of $2,000.00, which represented the funds deposited for payment toward judgment on behalf of Smith and Bellehumeur. The check was drawn payable to the Firm and was deposited into the Firm's operating account. The firm was actually entitled to only $550.00 in fees from Smith and Bellehumeur from the funds collected by Respondent. Respondent's one-third share should have been $183.33. As a result of the deposit of the funds belonging to Smith and Bellehumeur into the general account, the Firm paid respondent $999.99 instead of $183.33 to which he was entitled.

### (2) Misrepresentations Regarding Filing of Complaints and Fabrication of Court Documents

In addition to misusing clients' money held in escrow, Respondent also failed to adequately represent three clients: Atlantic Pools & Spas, Inc., the Mayor and City Council of Ocean City, and the Worcester Preparatory School. As more fully discussed below, with respect to these clients, Respondent drafted complaints which he never filed, misrepresented to partners of the Firm that the complaints had been filed, and, in at least one case, fabricated court documents to support his falsehoods.

The Firm never billed Atlantic Pools & Spas, Inc., the Mayor and City Council of Ocean City, or the Worcester

Preparatory School for work Respondent falsely claimed he had done.

## (a) *Atlantic Pools & Spas, Inc.*

Mark Cropper, a partner in the Firm, assigned Respondent two collections matters to handle for the Firm's client, Atlantic Pools & Spas, Inc. One matter was against Anthony J. Diver and Jacqueline A. Bradley–Diver ("the Divers"). The other matter was against Robert and Sharon Anthony ("the Anthonys"). Respondent falsely told Mr. Cropper that he had filed suit on behalf of Atlantic Pools & Spas, Inc. against the Divers and the Anthonys. Respondent prepared pleadings, which he never filed with the appropriate Court, and fabricated complaints and summonses to support his misrepresentations that suits were initiated.

On or about December 17, 2008, Mr. Cropper checked the Maryland Judiciary website and discovered that no suits had been filed on behalf of Atlantic Pools & Spas, Inc. Mr. Cropper had his assistant, Patricia Corso, send an e-mail to the vacationing Respondent, checking on the status of these cases so that he could inform the client. Respondent falsely replied to Ms. Corso by e-mail that day, stating that both suits were filed in late 2007, that the Anthony case was set for trial on February 12, 2009, and that he was waiting for an affidavit from the process server in the Divers case. Based on those misrepresentations, the Firm informed the client that suits had been filed and provided copies of the fictitious pleadings and court notices. In fact, Respondent never filed the complaints on behalf of Atlantic Pools & Spas, Inc.

## (b) *Mayor and City Council of Ocean City, MD*

Guy R. Ayres, III, a partner in the Firm, assigned Respondent a collection matter to handle on behalf of the Firm's client, the Mayor & City Council of Ocean City, against April Brilliant t/a Mystic Productions. When Mr. Ayres inquired about the status of the case in late 2008, Respondent told him that he had filed suit against Ms.

Brilliant, obtained a judgment, and filed a writ of garnishment to initiate collection of the judgment. In fact, Respondent never filed suit against Mr. Brilliant on behalf of the Mayor & City Council of Ocean City. Another attorney filed the actual complaint after Respondent left the firm in December 2008.

### (c) *Worcester Preparatory School*

William E. Esham, III, a partner in the Firm, assigned Respondent two collections cases to handle on behalf of the Firm's client, Worcester Preparatory School. Respondent misrepresented to Mr. Esham that he had filed suit in both matters when, in fact, he had not done so. In one of the matters, *Worcester Preparatory School v. Leonhart,* the Respondent claims that he prepared the complaint; however, he admits that he never filed it. In the other matter, the Firm's client decided not to proceed against the defendant after the Respondent's transgressions came to light.

## II.

## Conclusions of Law

## Maryland Rules of Professional Conduct 1.1—Competence

■ This Court finds by clear and convincing evidence that Respondent violated Maryland Rule of Professional Conduct 1.1 by failing to provide competent representation to Atlantic Pools & Spas, Inc., the Mayor and City Council of Ocean City, and the Worcester Preparatory School. First, with respect to Atlantic Pools & Spas, Inc., Respondent misrepresented to Mr. Cropper that he had initiated two suits on behalf of the client. In fact, Respondent had prepared pleadings that were, for no articulable reason, never filed and further fabricated complaints and summonses to make it appear that he was prosecuting the cases and adequately representing the client.

Second, with respect to the Mayor and City Council of Ocean City, Respondent misrepresented to Mr. Ayres that he had filed suit, obtained a judgment, and filed a writ of garnishment. In fact, Respondent never filed suit against Ms. Brilliant on behalf of his client.

Finally, with respect to the Worcester Preparatory School, Respondent misrepresented to Mr. Esham that he had filed two suits on behalf of the client. In fact, Respondent never filed either suit, although he may have prepared a complaint in one case.

Certainly, Respondent possessed the legal knowledge, skill, and ability to initiate suits on behalf of his clients; however, he chose to act contrary to his legal aptitude. In electing to not file certain complaints and to falsify complaints and summonses, Respondent failed to provide competent representation to his clients and violated Maryland Rule of Professional Conduct 1.1.

## Maryland Rules of Professional Conduct
### 1.15(a), (c)—Safekeeping Property

 This Court finds by clear and convincing evidence that Respondent violated Maryland Rule of Professional Conduct 1.15 by making inappropriate transfers of clients' funds from the Firm's escrow account to the general account without the clients' informed, written consent. With respect to Royalton Motor Hotel, LLC, the Firm collected $5,000.00 on behalf of its client and initially credited its escrow account with those funds. Respondent improperly disbursed those funds on June 30, 2008 to the general account and referenced an unrelated client file number in order to collect one-third of those funds as compensation.

With respect to Smith and Bellehumeur, Respondent obtained a judgment, then received funds in payment thereof which were initially deposited in the Firm's escrow account. Later, on September 30, 2008, Respondent disbursed from the Firm's escrow account to its general account as fees, $2,000.00, which represented funds that had been originally deposited for the benefit of Smith and

Bellehumeur. As a result of the transfer, Respondent received a one-third share which was larger than that to which he was entitled.

The Court was presented with no evidence to indicate that the clients gave informed consent in writing which may have allowed Respondent to transfer the funds from the Firm's escrow account to its general account for the Respondent's benefit. In transferring money from the Firm's escrow account to its general account as fee payments, which Respondent admits he was not entitled to do, Respondent violated Maryland Rule of Professional Conduct 1.15.

## Maryland Rules of Professional Conduct
### 8.4(b)-(d)—Misconduct

This Court finds by clear and convincing evidence that Respondent violated Maryland Rule of Professional Conduct 8.4 by: (1) improperly disbursing clients' funds from the Firm's escrow account to its general account, (2) failing to file complaints and misrepresenting the status of the cases to partners in the Firm, and (3) fabricating complaints and summonses to support his series of falsehoods.[9]

More specifically, this Court finds by clear and convincing evidence that Respondent violated Maryland Rule of Professional Conduct 8.4(b) in that he misused clients' funds held in the Firm's escrow account by transferring those funds to the operating account as fees in order to improve his chances of becoming a partner in the Firm. As discussed below, this Court also finds by clear and convincing evidence that Respondent violated Maryland Code Ann., Business Occupations & Professions Art., § 10–306, which carries a criminal penalty. Maryland Code Ann., Business Occupations & Professions Art., § 10–606(b) provides that

---

9. Judge Wilson's conclusion that Respondent violated Rule 8.4(b), (c), and (d) implies necessarily that Respondent violated Rule 8.4(a), which provides that "[i]t is professional misconduct for a lawyer to ... violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct...." *See Attorney Grievance Comm'n v. Rand,* 411 Md. 83, 95 n. 8, 981 A.2d 1234, 1241 n. 8 (2009).

"[a] person who willfully violates any provision of Subtitle 3, Part I of this title . . . is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $5,000.00 or imprisonment not exceeding 5 years or both." Although criminal charges have not yet been brought against Respondent, certainly his conduct and admissions could lead a trier of fact to find him guilty beyond a reasonable doubt of misusing clients' trust funds, which reflects adversely on his honesty, trustworthiness, and/or fitness as a lawyer.

█ Additionally, this Court finds by clear and convincing evidence that Respondent violated Maryland Rule of Professional Conduct 8.4(c) in that he misused clients' funds held in escrow, misrepresented the status of cases to partners in the Firm who unknowingly passed along those lies to the clients, and fabricated court documents to support his misrepresentations that suits had been filed in several cases. The Court finds that all of these actions demonstrate that Respondent was dishonest, fraudulent, and deceitful.

█ Furthermore, this Court finds by clear and convincing evidence that Respondent violated Maryland Rule of Professional Conduct 8.4(d). In failing to file complaints on behalf of clients, and in fabricating court documents to support his misrepresentations to partners in the Firm and to clients, Respondent engaged in conduct that was prejudicial to the administration of justice.

### Maryland Rule 16–609(a)—Prohibited Transactions

█ This Court finds by clear and convincing evidence that Respondent violated Maryland Rule 16–609 by disbursing client funds from the Firm's escrow account to its operating account for an unauthorized purpose. As discussed more fully above, Respondent admits that he transferred money that rightfully belonged to his clients, Royalton Motor Hotel, LLC, and Smith and Bellehumeur, from the Firm's escrow account to its general account for the purpose of making it appear that his collected fees were higher. Respondent did so in order to improve his chances

of becoming a partner in the Firm. Respondent's purpose for transferring the funds was not authorized by the clients.

### Maryland Code Ann., Business Occupations & Professions Art., § 10–306—Misuse of trust money

 This Court finds by clear and convincing evidence that Respondent violated Maryland Code Ann., Business Occupations & Professions Art., § 10–306 by making inappropriate transfers of clients' funds from the Firm's escrow account to its general account for the purpose of making it appear that his collected fees were higher. Respondent did so to improve his chances of becoming a partner in the Firm and to receive increased compensation. Thus, Respondent used the trust funds for a purpose other than that for which they were entrusted to him.

### III.

### Mitigation Findings

**A. The Court's Findings**

Having had ample opportunity to assess Respondent's credibility, the Court finds by a preponderance of the evidence [10] that Respondent is remorseful for his misconduct. Respondent admitted that he moved money from the Firm's escrow account to its general account with knowledge that the money was not rightfully his. Respondent further admitted that he did not adequately represent his clients. Respondent confessed that he lied to the partners in the Firm and that those lies were in turn passed on to the clients.

The Court finds by a preponderance of the evidence that since December 2008, Respondent has been forthcoming about his misconduct and fully cooperative. In January

---

**10.** *See* Md. Rule 16–757(b) ("A respondent who asserts ... a matter of mitigation or extenuation has the burden of proving the defense or matter by a preponderance of the evidence.").

2009, Respondent sought legal counsel and ultimately hired Andrew Jay Graham of Baltimore, Maryland to assist him in self-reporting his misconduct. On January 22, 2009, Respondent, through Mr. Graham, sent Glenn M. Grossman, Deputy Bar Counsel [at the time] with the Attorney Grievance Commission of Maryland, a letter admitting his violations of the Rules of Professional Conduct.

Respondent was also cooperative in that he made himself readily available to Mark Fiedler, investigator for the Attorney Grievance Commission of Maryland. Mr. Fiedler's "Final Report" dated May 18, 2009 confirms that Respondent was cooperative. In that Final Report, Mr. Fiedler writes:

"The Respondent was cooperative during his interview. He provided explanation and detail voluntarily concerning all of the client matters. The Respondent acknowledged the impropriety of his actions, indicating this conduct was out of character for him and he was at a loss to explain why it occurred."

Furthermore, throughout the proceedings, Respondent was cooperative with Mr. Botluk,[11] who appeared at the evidentiary hearing on behalf of Petitioner. Respondent agreed to submit stipulations rather than to engage the Court in an adversarial hearing because he knew that he had acted improperly and that he had to face the consequences.

Respondent candidly told the Court that he could not explain why he made the poor choices that led to this proceeding. He had difficulty determining why he was willing to risk his legal career of ten years and the support of his family over a few thousand dollars. He indicated that his desire to achieve a balance between family and work life, coupled with an increased pressure to become a partner at the Firm likely triggered his first instance of misconduct in June 2008 and the series of bad decisions that followed. He

---

11. James P. Botluk, Esq., Assistant Bar Counsel, prosecuted this case.

notes that he was not driven by financial gain, but rather, by a desire to remain with the Firm.

Respondent testified that from the time he joined the Firm in 1999 until late 2007, he had been comfortable with his position as an associate. In late 2007 or early 2008, Respondent perceived additional pressure from the Firm to increase his billings and to bring more clients to the Firm. Respondent expressed that he felt as though he was faced with a decision to either "move up or move out." In other words, Respondent believed that he could either perform well enough to become a partner in the Firm or be left with no other option but to leave the Firm. Respondent stated that he attached his entire professional identity to the Firm and that he struggled with the concept of having to find other employment.

While Respondent was on vacation with his family in Florida in December 2008, partners at the Firm began to question some of Respondent's work. Although Respondent initially continued to lie to the partners, he ultimately confessed to one partner before returning home and requested a meeting with all of the partners to divulge his misconduct. Not only did Respondent explain the problems that the partners had identified while he was on vacation, but he also revealed misconduct that had not yet come to the partners' attention. The Firm terminated Respondent following the meeting in December 2008. Shortly thereafter, Respondent sought counseling with Dr. Zweig, a psychologist in Salisbury, Maryland. Dr. Zweig treated Respondent from early January 2009 until the fall of 2009. Respondent was not diagnosed as suffering from any mental illness or condition.

The Court finds by a preponderance of the evidence that the Firm and the clients impacted by Respondent's misconduct suffered no pecuniary losses. The Court further finds that Respondent has not been disciplined previously for any professional misconduct and is not currently the subject of any other complaints to the Attorney Grievance Commission.

## B. Letters of Reference

In mitigation, Respondent submitted letters of reference to the Court with no objection from counsel for Petitioner. The Court summarizes those six letters as follows:

First, James P. Murray, District Public Defender, wrote a letter on behalf of the Respondent, indicating that he has known Respondent for approximately ten years. In that time, Mr. Murray assessed Respondent as an individual who "acted professionally, competently, and always well mannered and courteous to others." Mr. Murray acted without reservation in authorizing Respondent to do "panel conflict" cases for the Office of the Public Defender because Mr. Murray believes Respondent is competent to handle such matters. Mr. Murray expressed his hope that Respondent would one day be presented with an opportunity to redeem himself following his deceitful and unethical behavior.

Second, Michael W. Farlow, Deputy State's Attorney for Worcester County, wrote a character reference letter on behalf of the Respondent. Mr. Farlow, who has known Respondent for the duration of his professional career, identifies Respondent as respectful, professional, and remorseful for his misconduct. Mr. Farlow believes that the incidents of misconduct were an aberration of Respondent's character and that Respondent is entitled to, and has earned, another chance.

Third, S. James Sarbanes, an attorney with Laws & Sarbanes, P.A., wrote a letter in support of the Respondent. Mr. Sarbanes notes that he has known Respondent for over ten years, both professionally and personally. Mr. Sarbanes views Respondent as an individual who is an outstanding friend, who is dedicated to the community and his family, and who is of strong professional and personal character. In assessing an appropriate penalty, Mr. Sarbanes hopes that the Court will take a complete look at Respondent and not just at Respondent's mistakes.

Fourth, John T. Zweig, Ed. D., Psychologist, wrote a letter on behalf of Respondent who is his patient. Dr.

Zweig notes that Respondent initiated his own therapy on January 13, 2009. Dr. Zweig describes Respondent as neat, well-groomed, and articulate. Dr. Zweig indicates that Respondent never complained about or criticized members of the Firm in subsequent interviews. Dr. Zweig comments on Respondent's lack of insight into his own situation. Dr. Zweig identifies an absence of clearly identifiable clinical syndromes. In his professional opinion, Dr. Zweig believes that the problem Respondent faces will "require ongoing, long-term dynamic psychotherapy" in order for Respondent "to better understand the blind spot in his personality." Dr. Zweig concludes that "from a psychological standpoint, a solo law practice could be operated within reasonable ethical limits by a lawyer with this kind of problem."

Fifth, Richard J. Brueckner, Assistant State's Attorney for Wicomico County, Maryland, also wrote a letter on Respondent's behalf. Mr. Brueckner has known Respondent for about two years and has interacted with Respondent in several capacities. Mr. Brueckner has come to know Respondent as instrumental in the success of the Salisbury School's MSBA mock trial team. Mr. Brueckner has also come to know Respondent as opposing counsel in several cases. Mr. Brueckner notes that Respondent represents his clients zealously, professionally, and with integrity. Finally, through his membership on the Lawyer's Assistant Program Committee for the Maryland State Bar Association, Mr. Brueckner has come to know Respondent as someone who is extremely remorseful for his actions. Mr. Brueckner identifies Respondent's behavior as aberrant and contrary to Respondent's true character.

Finally, Jeff M. Thaler, former Chairman of the Ocean City Board of Zoning and Appeals, wrote on Respondent's behalf. Mr. Thaler identifies Respondent as "knowledgeable, efficient, and totally professional in his conduct." Mr. Thaler notes that in the seven years that he worked on the Board with Respondent and the three years that he worked with him in his law practice, Respondent always had the "highest standards of ethics and professionalism." Mr.

Thaler characterizes Respondent as "an excellent attorney that truly cares about the job he is doing."

## IV.

### Standards of Review

The Court of Appeals has "original and complete jurisdiction over all attorney disciplinary matters arising from the conduct of a member of the Maryland State Bar." *Attorney Grievance Comm'n v. Pak,* 400 Md. 567, 599–600, 929 A.2d 546, 565 (2007); *see Attorney Grievance Comm'n v. Maignan,* 390 Md. 287, 292, 888 A.2d 344, 347 (2005); *Attorney Grievance Comm'n v. Seiden,* 373 Md. 409, 414, 818 A.2d 1108, 1111 (2003). While we conduct an independent review of the record developed below, the hearing judge's findings of fact generally will be accepted unless they are clearly erroneous. *Attorney Grievance Comm'n v. Thomas,* 409 Md. 121, 147, 973 A.2d 185, 201 (2009); *Attorney Grievance Comm'n v. Ugwuonye,* 405 Md. 351, 368, 952 A.2d 226, 235–36 (2008). As to the hearing judge's recommended conclusions of law, however, "[t]he Court of Appeals shall review [those] *de novo* . . . ." Md. Rule 16–759; *see Attorney Grievance Comm'n v. Nussbaum,* 401 Md. 612, 632, 934 A.2d 1, 13 (2007); *Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002).

## V.

### All That Is Left To Us Here Is To Determine the Appropriate Sanction.

Neither Petitioner nor Respondent took written exceptions to Judge Wilson's findings of fact, recommended conclusions of law, or mitigation findings. Therefore, we "treat the findings ... as established for the purpose of determining appropriate sanctions...." Md. Rule 16–759(b). Further, Respondent concedes, and we agree, that the hearing judge's conclusions of law are supported by clear and convincing evidence. The only question to be resolved by us is the

appropriate sanction. Petitioner, in its Recommendation for Sanction, argues that "Respondent's intentional misuse of client funds and his intentional misrepresentations warrant disbarment." Respondent, representing himself, urges this Court to impose a sanction less than disbarment, arguing, on one hand, that he would hope the Court would impose a definite period of suspension, yet conceding that "an indefinite suspension, in this case, I think, would be warranted."

"The appropriate sanction for violations of the Maryland Rules of Professional Conduct 'depends on the facts and circumstances of each case, including consideration of any mitigating factors.' " *Nussbaum,* 401 Md. at 642–43, 934 A.2d at 19 (quoting *Attorney Grievance Comm'n v. Zuckerman,* 386 Md. 341, 375, 872 A.2d 693, 713 (2005)). As this Court has noted time and time (and time) again, in fashioning a sanction for violating the Rules of Professional Conduct, "our aim is to protect the public and the public's confidence in the legal profession rather than to punish the attorney." *Attorney Grievance Comm'n v. Edib,* 415 Md. 696, 718, 4 A.3d 957, 971 (2010) (quoting *Attorney Grievance Comm'n v. Taylor,* 405 Md. 697, 720, 955 A.2d 755, 768 (2008)); *see Attorney Grievance Comm'n v. Guberman,* 392 Md. 131, 136, 896 A.2d 337, 340 (2006) (quoting *Rheb v. Bar Ass'n of Baltimore City,* 186 Md. 200, 205, 46 A.2d 289, 291 (1946) (stating that it is this Court's duty to "uphold the highest standards of professional conduct . . . to protect the public from imposition by the unfit or unscrupulous practitioner")).

Respondent (among other things) repeatedly and intentionally misappropriated client funds (unearned fees) by transferring them from the Firm's escrow account to the Firm's general account, in order to make it appear (for partnership consideration) as if he was bringing in more income to the firm (and to collect one-third of those funds as compensation, pursuant to his compensation arrangement with the firm), than he earned justifiably through actual effort. It has long been settled that "an attorney's misappropriation . . . of funds entrusted to his care, be the amount small or large, is of great

concern and represents the gravest form of professional misconduct." *Thomas,* 409 Md. at 175, 973 A.2d at 218 (quoting *Attorney Grievance Comm'n v. Pattison,* 292 Md. 599, 609, 441 A.2d 328, 333 (1982)). Accordingly, when an attorney of this State commits the grievous act of misappropriating funds, "particularly when combined with dishonesty or misrepresentation, [it] will result 'inevitably' in disbarment." *Attorney Grievance Comm'n v. Nwadike,* 416 Md. 180, 204, 6 A.3d 287, 301 (2010). Before concluding whether disbarment is the appropriate sanction in this case, we normally pause to consider any and all mitigating factors; "however, [when] it appears that the attorney has engaged in intentional dishonest conduct . . ., the bar is set especially high, and disbarment will be the appropriate sanction absent 'compelling extenuating circumstances.' " *Attorney Grievance Comm'n v. Steinberg,* 395 Md. 337, 375, 910 A.2d 429, 451 (2006).

In 2001, Judge Dale R. Cathell, writing for this (unanimous) Court in the to be oft-cited case of *Attorney Grievance Comm'n v. Vanderlinde,* 364 Md. 376, 773 A.2d 463 (2001), explained what the Court might accept as "compelling extenuating circumstances" in certain attorney discipline matters. Because much angst and consternation has arisen in applying *Vanderlinde* to attorney discipline cases in the almost decade since it was filed, we think it worth revisiting in some detail today.

In *Vanderlinde,* the respondent attorney was charged with violating MRPC 8.4(a), (b), and (c). *Vanderlinde,* 364 Md. at 381, 773 A.2d at 466. While working in a position not involving the practice of law, Vanderlinde misappropriated nearly $4,000 from her employer, which she used for her own purposes. *Vanderlinde,* 364 Md. at 381, 773 A.2d at 465. By the time she ceased working for that employer, she replaced the sum of money, the earlier absence of which went undetected by the employer. *Vanderlinde,* 364 Md. at 381, 773 A.2d at 465–66. Before the hearing judge, she admitted to violating MRPC 8.4(a), (b), and (c), but offered a number of mitigating considerations, in support of her position that a sanction of less than disbarment was warranted. *See Vanderlinde,* 364

Md. at 382–83, 773 A.2d at 466–67. These mitigating factors included: the death of her first husband; a failing second marriage; a personality disorder; mild to moderate depression; and Cavernous Vascular Malformation.[12] *See Vanderlinde,* 364 Md. at 382–84, 773 A.2d at 466–68. We began our analysis of the weight that ought to be accorded these facts by conducting a lengthy and impressive survey of decades of jurisprudence discussing what mitigating circumstances constitute "compelling extenuating circumstances." *See Vanderlinde,* 364 Md. at 389–413, 773 A.2d at 471–485. Ultimately, the Court distilled this extensive body of case law, concluding that

> in cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as 'compelling extenuating circumstances,' anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the 'root cause' of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC.

*Vanderlinde,* 364 Md. at 413–14, 773 A.2d at 485. Accordingly, Petitioner, in its Recommendation for Sanction in the present case, relies on *Vanderlinde* in arguing that "[t]o prove mitigation in matters involving dishonesty and intentional misappropriation of client funds, the Respondent must prove that he had a serious and debilitating mental condition affecting his ability to function in normal day-to-day activities."

While the Court in *Vanderlinde,* in canvassing decades of prior inconsistent application by the Court in attorney discipline opinions of sanctions meted-out for violations involving fraud, dishonesty, and misappropriation, certainly was "appl[ying] the facts and circumstances of that case to determine the appropriate sanction," *Attorney Grievance Comm'n*

---

12. A Cavernous malformation, also called a "cavernoma" is a "type of tumor-like vascular malformation in the brain with … risk of bleeding, which can cause epileptic seizures." G. Kramer, Epilepsy from A to Z—A Dictionary of Medical Terms 113 (Ethan Taub trans., 2004) (1996).

*v. Lane,* 367 Md. 633, 647, 790 A.2d 621, 628–29 (2002), and intended its rule to be applied prospectively to similarly-situated cases. *See Vanderlinde,* 364 Md. at 381, 773 A.2d at 466 ("We shall ... declare and reiterate once again the current position of the Court...."); 364 Md. at 389, 773 A.2d at 471 ("[O]ur position, hopefully, will become clearer to members of the bar...."); 364 Md. at 414, 773 A.2d at 485–86 ("The position we reiterate today is intended to apply to cases involving dishonesty, stealing, intentional misappropriation, fraud, serious criminal offenses, and the like...."); 364 Md. at 418, 773 A.2d at 488 ("Upon reflection as a Court, in disciplinary matters, we will not *in the future* attempt to distinguish between degrees of intentional dishonesty based on convictions, testimonials or other factors.") (emphasis added). What was somewhat less clear, however, was whether, in crafting its rule, the *Vanderlinde* Court focused exclusively on a mental disability [13] that is the "root cause" of an attorney's misconduct as the only mitigating factor that may constitute acceptable "compelling extenuating circumstances." That is, in cases involving intentional dishonesty, intentional misappropriation, fraud, stealing, and/or serious criminal conduct, is a mental disability that is the "root cause" of the misconduct the only mitigating factor for which this Court will impose a sanction less than disbarment? Stated yet another way, was *Vanderlinde* intended merely to stand for the proposition that, *when faced with proffers of mitigation involving mental disability,* such proffers must pass the "root cause" analysis? We believe that the language of *Vanderlinde* itself, and of subsequent cases applying its reasoning, supports an affirmative response to at least the latter rhetorical query.

In *Vanderlinde,* the Court understood the respondent to be "assert[ing] that the pressures of her life and the impairment

---

**13.** For purposes of this opinion, we include drug and alcohol abuse and dependency—both thoroughly discussed in *Vanderlinde*—under the banner of "mental disability." *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 191–297 (4th ed., text revision 2000) (classifying "substance-related disorders" as a group of "mental disorders").

of her mental faculties, including her periods of depression, mitigate against severe sanctions...." *Vanderlinde,* 364 Md. at 381, 773 A.2d at 466. In laying out the road-map that the analysis would follow, the Court stated that

> we shall address those concerns, then discuss the history of the cases of this Court where *similar problems* have been proffered as mitigation.... We shall then declare and reiterate once again the current position of the Court in respect to the appropriateness of using *such matters* to mitigate findings or sanctions in cases involving theft, misappropriation or other forms of dishonest conduct.

*Vanderlinde,* 364 Md. at 381–82, 773 A.2d at 466 (emphasis added). The usage of the phrases "similar problems" and "such matters" (referring to Vanderlinde's pressures of life and impairment of her mental faculties as mitigators) informs that (1) the *Vanderlinde* survey of mitigation-of-sanction jurisprudence was limited purposefully to those cases dealing with mental disability; and, more importantly, (2) Vanderlinde intended its holding to apply only to situations where similar mental disability mitigation defenses are offered by a respondent.[14] *See, e.g., Attorney Grievance Comm'n v. Christopher,* 383 Md. 624, 648, 861 A.2d 692, 706 (2004) (affirming the hearing judge's factual finding that an attorney's debilitating mental and physical condition was the root cause of his misconduct and such mental and physical impairments constituted compelling extenuating circumstances; Court mitigated disbarment to an indefinite suspension therefor).

Were there any doubt that the rule announced in *Vanderlinde* was not intended to apply to all cases involving inten-

---

**14.** Other language from *Vanderlinde* supports this conclusion. *See, e.g., Vanderlinde,* 364 Md. at 389, 773 A.2d at 470–71 ("The Court, in its internal discussions on this matter and in cases ... has already been reassessing the appropriateness of using *alcoholism and other substance abuse* as factors to be considered in mitigation.... We shall attempt to resolve at least some of the *above questions* in our discussions in the present case.") (emphasis added); 364 Md. at 414, 773 A.2d at 485–86 ("The position we reiterate today ... is not intended to restrict consideration of *alcoholism, mental impairments, and the like* in other situations.") (emphasis added).

tional dishonesty, intentional misappropriation, fraud, stealing, and serious criminal conduct—i.e., those involving mental disability mitigation proffers and those not—Judge Cathell, for the Court, answered the question conclusively only a year after authoring *Vanderlinde* for the Court. In *Attorney Grievance Comm'n v. Lane,* 367 Md. 633, 790 A.2d 621 (2002), he stated that

> [w]e did not apply *Vanderlinde* as a bright-line rule, but applied the facts and circumstances of that case to determine the appropriate sanction. What *Vanderlinde* holds is that "ordinarily" disbarment will be the appropriate sanction when dishonesty is involved, however, we must still examine the facts, circumstances, and mitigation in each case.

*Lane,* 367 Md. at 647, 790 A.2d at 628–29. As mentioned *infra,* we think it clear that the *Vanderlinde* Court believed that it was imposing a bright-line rule; but, as clarified in *Lane,* the bright-line rule should be understood to apply only to "the facts and circumstances of that case"—i.e., cases of misconduct involving intentional misappropriation, intentional dishonesty, fraud, stealing, and serious criminal offenses where mental disability is offered as mitigation of the normal sanction of disbarment. This conclusion is consistent with the long-chanted mantra that the appropriate sanction in an attorney-discipline matter " 'depends on the facts and circumstances of each case.' " *Nussbaum,* 401 Md. at 642–43, 934 A.2d at 19 (quoting *Zuckerman,* 386 Md. at 375, 872 A.2d at 713); *see Attorney Grievance Comm'n v. Pollack,* 289 Md. 603, 609, 425 A.2d 1352, 1355 (1981).

*Vanderlinde* is relevant to the present case as Respondent, in attempting to explain his misconduct, proffered backward-looking evidence from his post-misconduct visits with Dr. Zweig, a psychologist. *Vanderlinde,* however, is inapposite in dealing with Respondent's other claims of mitigation, including his remorse, cooperation with bar counsel, lack of pecuniary loss to clients, reputation in the legal and professional communities, and some degree of self-reporting of his misconduct.

These non-mental-illness claims will be examined in light of the gravity of Respondent's misconduct and prior case law.

*Vanderlinde* appears to lay out a three-step process to determine whether a mental disability rises to the level of mitigating the otherwise appropriate sanction of disbarment—in cases involving intentional misappropriation, dishonesty, fraud, stealing, or other serious criminal conduct—to something less than disbarment. First, there "needs to be almost conclusive, and essentially uncontroverted evidence that ... the attorney had a serious and debilitating mental condition." *Vanderlinde*, 364 Md. at 418–19, 773 A.2d at 488. Second, the mental condition must serve as the "root cause" for the misconduct—meaning, it must "affect[ ] the ability of the attorney in normal day to day activities, such that the attorney was unable to accomplish the least of those activities in a normal fashion." *Vanderlinde*, 364 Md. at 419, 773 A.2d at 488. Finally, the mental condition must "also result in [the] attorney's utter inability to conform his or her conduct in accordance with the law and with the [Rules of Professional Conduct]." *Vanderlinde*, 364 Md. at 414, 773 A.2d at 485. Respondent's evidence as to his encounters with Dr. Zweig fails all three tests. Regarding the first, Judge Wilson concluded that "Respondent was not diagnosed as suffering from any mental illness or condition," and that "Dr. Zweig identifies an absence of clearly identifiable clinical syndromes." Further, regarding the first and second tests, at oral argument, Respondent stated that Dr. Zweig "never put his finger on and said 'well, this is a mental disorder or something that caused you to do it.'" Therefore, Respondent does not suffer from a "serious and debilitating mental condition," nor was any psychological issue the "root cause" of the misconduct. And, while Dr. Zweig, in his letter on behalf of Respondent, stated that Respondent has a "blind spot in his personality," it does not appear that this deficiency caused Respondent to be incapable of conforming his conduct in accordance with the law, the Maryland Rules of Professional Conduct, and other statutory or regulatory requirements. Accordingly, taken alone, any alleged psychological issues Respondent was deal-

ing with contemporaneously with his misconduct do not rise to a level sufficient to meet *Vanderlinde*'s requirements, and therefore, without more, do not mitigate the sanction here to less than disbarment.

We turn now to the other mitigating factors found by the hearing judge, including Respondent's remorse, cooperation with bar counsel, otherwise fine reputation in the legal and professional communities, a lack of pecuniary loss to clients, and some degree of self-reporting of portions of his misconduct.[15] It is, however, important to clarify the lens through which we view these other mitigating factors. As stated in

---

**15.** At oral argument, members of the Court asked questions and/or offered remarks that could be said fairly to raise the spectre of mitigating the sanction to an indefinite suspension because of Respondent's "self-reporting" of his misconduct. The record of this case does not support the notion, however, that solely Respondent's conscience led him to self-report all of his misconduct where it otherwise would have gone undiscovered. Rather, attorneys at his former firm discovered that claimed action had not been taken on various cases to which Respondent had been assigned, and it was not until the firm confronted him about that misconduct (which Palmer denied initially) that Respondent ultimately disclosed to the partners at a December 2008 face-to-face meeting the full extent of his dereliction and other misconduct. Even assuming pure self-reporting, while we suggest that it can and should be considered by this Court in mitigation, *see* ABA Standards for Imposing Lawyer Sanctions § 9.32(e) (1992) (listing "full and free disclosure to disciplinary board" as a factor to be considered in mitigation), we decline to adopt a *per se* rule of mitigation from disbarment to indefinite suspension in cases involving intentional misappropriation of client funds and intentional dishonesty. This view is in accord with other jurisdictions that have considered the weight that self-reporting should be given in misappropriation cases. *See People v. Adkins*, 57 P.3d 750, 753 (Colo.2001) ("Although her counsel argued several forms of mitigation (Ms. Adkins' *self-reporting of her wrong doing*, her cooperation ... her remorse, her husband's illness, her subsequent return of the money ..., her good reputation ..., none of these things, individually or in combination ... would have risen to the level of 'extraordinary factors of mitigation' necessary to justify any penalty short of disbarment.")) (emphasis added); *In re Rohr*, 122 N.M. 774, 931 P.2d 1390, 1391 (1997) ("All these factors—experiencing personal problems, making full disclosure to disciplinary authorities, cooperating in the disciplinary process, making a good faith effort at restitution, and showing sincere remorse—are recognized in mitigation by the ABA Standards for Imposing Lawyer Sanctions § 9.32.... They cannot, however, prevent disbarment of a lawyer who has stolen her client's money.").

*Attorney Grievance Comm'n v. Roberts,* 394 Md. 137, 166, 904 A.2d 557, 574–75 (2006):

> Misappropriation of funds by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment. . . . The sanction of disbarment is so justified because attorneys are charged with remembering that the entrustment to them of money and property of others involves a responsibility of the highest order. They must carefully administer and account for those funds. Appropriating any part of those funds to their own use and benefit without clear authority to do so cannot be tolerated.

(internal citations and quotation marks omitted). Accordingly, "when misappropriation of funds is at stake, . . . witnesses testifying to the attorney's honesty and integrity may be less persuasive." *Attorney Grievance Comm'n v. Mininsohn,* 380 Md. 536, 576, 846 A.2d 353, 377 (2004).

To this end, *Attorney Grievance Comm'n v. Ezrin,* 312 Md. 603, 541 A.2d 966 (1988) is instructive. In *Ezrin,* an attorney stole large sums of money from his law partners, but subsequently made full restitution to the partners. *Ezrin,* 312 Md. at 604, 541 A.2d at 966. This Court reviewed the arguments made in mitigation, including his stellar reputation as an attorney, his general good character, the lack of prior disciplinary actions, the restitution made to his law partners, and his cooperation with bar counsel. *Ezrin,* 312 Md. at 609, 541 A.2d at 969. We ultimately held, however, that "[n]one of these constitutes compelling extenuating circumstances . . . that would warrant a sanction other than disbarment." *Id.* Respondent here is situated similarly. He has no previous disciplinary record, and has no outstanding complaints lodged against him. His conduct here notwithstanding, he appears well-regarded in both the legal and general communities, with letters of reference from the District Public Defender (District 2) and the Deputy State's Attorney for Worcester County. Ultimately, no financial harm was suffered by either his law firm or its clients. He cooperated fully with bar counsel in the investigation and prosecution of this case. This Court, however, is unaware of a case where this cocktail of mitigating

factors has been recognized as sufficient to mitigate analogous violations—MRPC 1.1; 1.15(a), (c); 8.4(b), (c), (d); Maryland Rule 16–609 and Maryland Code (2000, 2010 Repl.Vol.), Business Occupations & Professions Article, § 10–306—to anything less than disbarment.[16] *See Attorney Grievance Comm'n v. Guida*, 391 Md. 33, 63, 891 A.2d 1085, 1102 (2006) ("We are not unmindful of other mitigating factors that appear on this record. . . . Respondent expressed contrition and remorse for his misconduct and refunded [the funds]. He was forthcoming in the complaint resolution process. . . . Yet, at bottom, Respondent fails to persuade us that something short of disbarment is appropriate in order to protect the public and deter other attorneys from similar misconduct."); *Attorney Grievance Comm'n v. Lazerow*, 320 Md. 507, 515–16, 578 A.2d 779, 783 (1990) ("[Respondent]'s general good character and reputation, the lack of prior misconduct, his restitution of the funds, and his remorse and shame are not compelling extenuating circumstances that would warrant a sanction less than disbarment.").[17]

---

**16.** This is not to say, however, that these mitigating factors become irrelevant should Respondent seek to be readmitted to the Bar. While we recognize the stigma that attaches to the sanction of disbarment, *see* CHARLES W. WOLFRAM, MODERN LEGAL ETHICS 128 (1986), practically speaking, a disbarred attorney, just like one assessed with an open-ended indefinite suspension, may reapply for admission at any time after imposition.

**17.** The three cases Respondent cites in support of his argument for something less than disbarment are inapposite. Neither *Attorney Grievance Comm'n v. Brown*, 415 Md. 269, 999 A.2d 1040 (2010), nor *Attorney Grievance Comm'n v. Smith*, 405 Md. 107, 950 A.2d 101 (2008), involved intentional misappropriation of client funds. *Attorney Grievance Comm'n v. McCulloch*, 397 Md. 674, 919 A.2d 660 (2007), did involve intentional misappropriation of funds in which this Court gave McCulloch an indefinite suspension; however, this Court explained that the hearing judge's finding vis á vis deceit and dishonesty was "at best ambiguous," and that "the hearing court had some doubt as to the level of the respondent's culpability" in holding that "[d]isbarment should not rest on such a finding." *McCulloch*, 397 Md. at 689, 919 A.2d at 668. Here, there is no ambiguity in the hearing judge's findings regarding Respondent's deceit and dishonesty or with regard to Palmer's culpability.

This Court has long held that "when a member of the bar is shown to be willfully dishonest for personal gain by means of fraud, cheating, or like conduct, absent the most compelling extenuating circumstances ... disbarment follow[s] as a matter of course." *Md. State Bar Assoc. v. Agnew,* 271 Md. 543, 553, 318 A.2d 811, 817 (1974). Having been presented with no sufficient "compelling extenuating circumstances," we hold that the appropriate sanction is disbarment.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST CHRISTOPHER ALLEN PALMER.**

BATTAGLIA, J., concurs.

BATTAGLIA, J., concurring.

I concur with the result reached in the Majority opinion in this case and the resulting sanction, because Palmer's self-reporting of his misconduct to Bar Counsel occurred only *after* his malfeasance had been revealed by the actions of others in his firm and because the Court in footnote 15 leaves open the possibility that true self-reporting of misconduct, without having been discovered by others already, possibly may serve as mitigation. In this vein, I believe that self-reporting should be encouraged by this Court and should be viewed as an important value to emulate. See, in this regard, Douglas R. Richmond, *Associates as Snitches and Rats,* 43 Wayne L.Rev. 1819 (1997) and *In re Cicardo,* 877 So.2d 980 (La.2004), for a discussion of self-reporting as a hallmark of professionalism.